929 P.2d 1288

STATE of Arizona, Appellee,

v.

Clifford Dean LACY, Appellant.

No. CR–93–0402–AP.

Supreme Court of Arizona,
En Banc.

Dec. 31, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Linda L. Knowles, Assistant Attorney General, Phoenix, for Appellee.

Harriette P. Levitt, Tucson, for Appellant.

## OPINION

ZLAKET, Vice Chief Justice.

On March 24, 1982, the bodies of Susan England and Teresa Acuña, students at the University of Arizona, were found in their Tucson apartment. Defendant Lacy was charged with both homicides in 1991. He was convicted of two counts of first degree murder in April 1993 and sentenced to death. This automatic appeal followed. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3), A.R.S. § 13–4031, and Rule 31.2(b), Ariz.R.Crim.P.

## FACTS

Susan's brother, Robert, was a medical student living with the young women. At approximately 11:15 p.m. on March 23, he left their apartment to study at the library. Susan was getting ready for bed, and Teresa was at work. Robert would later testify that he probably did not lock the door, believing that Teresa would secure it when she returned home.

Around 2:00 a.m., Rick Howell, another student living in the area, got on his bicycle to go to the library. He heard several unusual noises and rode towards them. Stopping near the victims' residence, he saw a light-colored compact car pull out of the driveway.

When Robert returned to the apartment at about 5:30 a.m., he discovered his sister, bound and gagged, lying on the living room floor. As he spoke to a 911 operator, he saw Teresa draped over a bed in an adjacent room. A box wrench lay across one of her arms. Robert also noticed that his white Dodge Omni, which had been parked in front of the apartment, was missing, along with a microwave oven, stereo system, and his medical bag.

Both young women died of gunshot wounds. Susan had been shot three times

behind her right ear. She also had a blunt force injury on the right side of her scalp and some fresh scratches on her right arm. Teresa had been shot once in the face and again in the back of her head. The order in which the shots were fired could not be determined.

The police found bullet casings in the apartment near the bodies of both victims. These were later traced to a .22 caliber semi-automatic pistol that co-defendant Bruce Stubblefield had given away soon after the murders. Investigators also obtained numerous fingerprints from the apartment, none of which matched those of defendant or Stubblefield. In the bedroom, they discovered a piece of paper bearing a partial bloody shoeprint in a diamond/arrowhead pattern, similar to that of an athletic shoe. There was no sign of forced entry into the premises.

Officers later located the abandoned Dodge Omni. Much of the car's interior had been burned, and the only fingerprints that could be lifted from it matched Susan's. They also found two shoeprints on the ground near its left rear door. These prints, like that in the apartment, were partial and had a diamond/arrowhead pattern.

On May 31, 1983, while in custody for an unrelated burglary, defendant spoke to police about the murders. He told them that he had accompanied Stubblefield to the apartment on the night in question. He said that Stubblefield owed him money from an earlier burglary the two had committed. According to defendant, Stubblefield knew one of the girls and intended to get some chemicals from her to make angel dust (PCP), which he would then sell to repay the debt. Using a key, Stubblefield entered the apartment. When Susan came out of the bedroom, he asked her for the chemicals. She refused, they began to argue, and he struck her. Teresa then came into the room and swung at Stubblefield with a wrench. He turned in her direction and fired a gun.

Defendant claimed that during this altercation he was standing in the kitchen. When the gun went off, he got scared and decided to leave. He attempted to exit the back door but found a table in the way. As he turned and headed towards the front door, he saw Stubblefield shoot Teresa in the face. He then heard a car outside and told his partner they had to go. Stubblefield instead hit Susan on the head with the gun. At that point, defendant saw a microwave oven, picked it up, and ran out the front door. He put the microwave behind some bushes, waited a while, and then returned to the apartment to find out what was delaying Stubblefield. When he re-entered the premises, he observed that Stubblefield had tied up Susan and was shooting her twice in the head. He then ran away. About five minutes later, Stubblefield, driving his own car, picked up defendant and the two retrieved the microwave. When defendant asked why he had shot the women, Stubblefield told him to shut up. He then drove defendant home.

In his statement, defendant asserted that the Omni was parked in the driveway when he left. He also admitted that he wore tennis shoes on the evening in question, while Stubblefield was in dress shoes.

Over eight years later, defendant and Stubblefield were charged with both murders and burglary of the apartment. They were tried separately. Stubblefield was acquitted by a jury that did not hear defendant's statements because they were ruled inadmissible. Although the burglary charge against defendant was dismissed on statute of limitations grounds, he was subsequently convicted of two counts of first degree murder. The jury, instructed as to both premeditated and felony murder, found him guilty of the latter on each count. The trial judge sentenced him to death, finding as aggravating factors the presence of multiple victims, A.R.S. § 13–703(F)(8), and crimes that were especially heinous, cruel or depraved, A.R.S. § 13–703(F)(6).

## TRIAL ISSUES

### *Preindictment Delay*

■ Defendant argues that the case against him should have been dismissed due

to a preindictment delay of more than eight years. He claims prejudice because of a loss of evidence, including raw data from a polygraph exam, the sneakers he was wearing at the time of his 1982 burglary arrest, and the testimony of various witnesses, such as his deceased wife, whom he says could have provided him with an alibi. He also complains that the lack of reports or notes by the detective initially assigned to the case hindered his review of investigative leads and witness interviews. Further harm occurred, he asserts, because another detective who worked on the case had a poor memory of events by the time it went to trial.

The statute of limitations is a defendant's primary protection against stale prosecutions. *See United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977); *State v. Broughton*, 156 Ariz. 394, 397, 752 P.2d 483, 486 (1988). In first degree murder cases, however, charges may be brought at any time. *See* A.R.S. § 13–107(A).

■ The due process guarantee of the Fifth and Fourteenth Amendments to the United States Constitution also protects defendants from unreasonable delay. *See Stoner v. Graddick*, 751 F.2d 1535, 1541 (11th Cir.1985); *Broughton*, 156 Ariz. at 397, 752 P.2d at 486. This safeguard, however, is narrower than that provided by statutes of limitation. *Lovasco*, 431 U.S. at 789, 97 S.Ct. at 2048; *Broughton* 156 Ariz. at 397, 752 P.2d at 486. A person claiming a due process violation must show that the prosecution intentionally slowed proceedings to gain a tactical advantage or to harass the defendant, and that actual prejudice resulted. *Id.*

Defendant does not allege that the delay here was intentional. He merely asserts that the prosecutor had enough information to try him after the 1983 statement and, therefore, any delay was unnecessary and unjustified. In *Lovasco*, however, the United States Supreme Court expressly refused to adopt a constitutional requirement that the state must file charges immediately upon securing sufficient evidence to prove guilt. 431 U.S. at 792, 97 S.Ct. at 2050.

Moreover, even in cases where an accused experiences some prejudice from a lapse of time, prosecutions following investigative delays do not necessarily offend due process. *Broughton*, 156 Ariz. at 398, 752 P.2d at 489. Here, the murder weapon was not recovered until 1991, and charges were filed shortly thereafter against both defendant and Stubblefield. Although the gun may not have been a crucial element of the state's case against defendant, it was nevertheless an important piece of evidence. Absent proof of an intentional delay for strategic or harassment purposes, therefore, this claim must fail. *See Stoner*, 751 F.2d at 1543 (finding 19–year non-investigative delay not violative of due process where there was no evidence it was intentional and to gain a tactical advantage).

### Voluntariness of the 1983 Statement

■ Defendant argues that his 1983 statement should not have been admitted because police induced it with an implied promise of leniency. Having examined the totality of circumstances, we cannot agree. *See State v. Scott*, 177 Ariz. 131, 136, 865 P.2d 792, 797 (1993), *cert. denied*, 513 U.S. 842, 115 S.Ct. 129, 130 L.Ed.2d 73 (1994).

■ In Arizona, confessions are prima facie involuntary, and the state has the burden of proving otherwise by a preponderance of the evidence. *State v. Lopez*, 174 Ariz. 131, 137, 847 P.2d 1078, 1084 (1992), *cert. denied*, 510 U.S. 894, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993). A confession must not have been induced by direct or implied promises, however slight. *State v. Tapia*, 159 Ariz. 284, 290, 767 P.2d 5, 11 (1988).

While defendant was in custody for an unrelated burglary in November 1982, Detectives Bustamante and Lowe talked to him about the young women's deaths. Defendant initially denied any knowledge of the murders. At the end of the interview, Bustamante made the following statement:

See I can't, I can't sit here and tell you or promise you anything.... And if I did

you'd be a fool to believe me cause you know I just don't like to do that kind of stuff. The only thing that I'm saying is that if you do know something about the two girls the county attorney's office is willing to look at your case a little bit different than [sic] if you tell me what you know about these two girls. They are going to look at your case a little bit different that [sic] just Clifford Lacy being here for x number of burglaries.... [T]here is a possibility that you might find out something down the road that could help me and help yourself.

Defendant claims that after the tape recorder was turned off, Bustamante told him that he was facing a lot of time and said, "I could help you out—you know—if you help me out." According to defendant, over the next several months, Bustamante led him to believe that he would receive immunity on the murder case and would "walk" on the other charges if he provided information about the killings. Defendant asserts that these overtures continued until less than a month before he made his May 1983 statement.

When defendant eventually decided to talk, he contacted the police to arrange a meeting. At the interview, Detective Reuter announced that a deputy county attorney was present "to give [defendant] some assurance that at a point and time depending on what information [he] had and the reliability of that information, that her office would consider entering into an agreement...." The detective also told him during the statement, "I think we've put all our cards on the table for you, we're going to help you out." However, when Reuter specifically asked defendant if he expected to benefit from making the statement, he replied, "I don't know." And when the detective later inquired if he was making the statement without promise or threat, defendant responded affirmatively.

At the suppression hearing, Officer Bustamante could not remember if he had contacted defendant after the November 1982 interview. He stated that he would not have promised a plea bargain in exchange for information and that, as he recalled, he did not make any deal with defendant. Based on this testimony and other evidence regarding the surrounding circumstances, the trial judge rejected defendant's argument that his statement should be suppressed, stating: "I think that, weighing everything, I'm satisfied that Mr. Lacy did not give this statement in consideration for any promises or agreements with the State." We will not disturb this finding absent clear and manifest error. *See State v. Hensley,* 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983).

In determining whether defendant's admissions were induced by promises, we must examine not only what was said before he gave the statement, *see, e.g., State v. Hanson,* 138 Ariz. 296, 301, 674 P.2d 850, 855 (App.1983), but also whether he justifiably relied on any assurances he obtained. Reuter's declaration that "I think we've put all our cards on the table for you, we're going to help you out," although possibly reinforcing the impression that there was going to be a deal, is not relevant because by that time defendant had already given most of his incriminating statement.

Detective Bustamante's remark during the November 1982 interview that "the county attorney's office is willing to look at your case a little bit different," standing alone, might be perceived as some assurance of a plea bargain or reduced sentence in exchange for information. However, the detective also made it clear that he could not promise anything. This sufficiently qualified his other comments. *See State v. Hall,* 120 Ariz. 454, 456–57, 586 P.2d 1266, 1268–69 (1978) (finding no promise when, in addition to statement that cooperation could affect sentencing, defendant was also told there would be "no deals"). Moreover, Bustamante testified at an evidentiary hearing that he did not recall making subsequent statements, as defendant claimed. It is for the trial court to resolve conflicts in testimony, and we will generally defer to that finding. *See State v. Jerousek,* 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979).

The record does not reflect whether the court actually found that no promise was made. However, there is evidence supporting the determination that defendant's statement was not given in reliance on or in response to assurances by the police. *See Hensley,* 137 Ariz. at 87, 669 P.2d at 65. Additionally, nothing in the record indicates that his will had been overcome. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225–27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *Hall,* 120 Ariz. at 456, 586 P.2d at 1268. Several months had passed between the alleged promise and defendant's statement, and he willingly contacted police when he decided to talk. This contradicts the suggestion that what he said resulted from improper police conduct. *See State v. Walton,* 159 Ariz. 571, 579–80, 769 P.2d 1017, 1025–26 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990) (no reliance when 45 minutes passed between alleged promise and confession); *State v. McVay,* 127 Ariz. 18, 20–21, 617 P.2d 1134, 1136–37 (1980) (confession valid when initiated by suspect). Defendant also admitted in his statement that he was not making it in exchange for any promises. On this record, we cannot say that the trial court erred in finding that the statement was voluntary.

### Admission of the Huff Burglary

■ Defendant argues that the trial court erred in admitting evidence of an unrelated burglary committed seven months after the murders. The victim, Dan Huff, saw defendant run out of his apartment and drive away. He notified police, who apprehended defendant as he was exiting his car. A search of the vehicle uncovered Huff's belongings and a pair of gloves. A .22 caliber revolver was also found on the ground near the driver's side door. Defendant told police he dropped the gun because he did not want anyone to get hurt.

■ An appellate court will not reverse evidentiary rulings absent an abuse of discretion. *State v. Robinson,* 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990), *cert. denied,* 498 U.S.

1127, 111 S.Ct. 1091, 112 L.Ed.2d 1195 (1991). Under Rule 404(b), Ariz.R.Evid., evidence of other crimes is inadmissible to prove a person's bad character or the likelihood that he or she acted in conformity with it. However, it may be introduced for other relevant purposes such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. *Id.* The probative value of such evidence must not be substantially outweighed by the danger of unfair prejudice, and there should be a limiting instruction, if requested. Rule 403, Ariz.R.Evid.; *State v. Atwood,* 171 Ariz. 576, 638, 832 P.2d 593, 655 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

The state argues that the evidence in question tended to show defendant's intent to commit burglary at the young women's home. Pointing to his possession of a gun and gloves following the Huff encounter, it speculates that defendant probably brought a weapon to the murder scene and left no fingerprints because he wore gloves to carry out a burglary.

In our view, the evidence was not admissible under Rule 404(b) because the crimes were dissimilar. *See State v. Jackson,* 124 Ariz. 202, 204, 603 P.2d 94, 96 (1979) (evidence of later rape inadmissible because of differences from crimes at issue); *cf. State v. Fierro,* 166 Ariz. 539, 547–48, 804 P.2d 72, 80–81 (1990) (evidence of prior burglary admissible to show later intent to burglarize when crimes occurred in the same neighborhood within a 48–hour period). The Huff incident occurred seven months after the homicides and was committed solely by defendant in the early evening when the apartment was unoccupied. The murders, on the other hand, involved two perpetrators and happened late at night when the young women were home. Testimony also indicated that when Huff showed up, defendant simply ran away; he never attempted to use a weapon to facilitate his escape. Moreover, the gun found near his car was not connected with the earlier murders, nor was there evidence indicating that police had ever looked for fingerprints at the Huff residence.

■ For this error to require reversal, however, there must be a reasonable probability that the verdict would have been different had the evidence not been admitted. *State v. Brady*, 105 Ariz. 190, 196, 461 P.2d 488, 494 (1969). By reason of defendant's statements to the police, the jurors were well aware that he had committed other burglaries. The trial court also gave an appropriate limiting instruction. Thus, any prejudice from the admission of the Huff burglary was substantially ameliorated. Based on the totality of the evidence, we are able to conclude beyond a reasonable doubt that the jury would have reached the same verdict even without mention of the later burglary. The erroneous admission was harmless on this record.

### Admission of Footprint Evidence

■ At trial, the state introduced photographs of shoeprints found in the front yard of the house from which the murder weapon was stolen, on a piece of paper in the young women's bedroom, and next to the abandoned Omni. Defendant argues that this evidence was irrelevant and that any probative value was outweighed by its prejudicial effect. He further asserts that it was insufficient to prove identity because the state's expert could determine no more than that the tread patterns were similar.

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Rule 401, Ariz.R.Evid. Defendant admitted that he and Stubblefield had previously stolen the murder weapon. He also acknowledged that, unlike Stubblefield, he had worn tennis shoes both during that burglary and at the victims' apartment. The prints tended to show that defendant may have been in the women's bedroom and near the abandoned Omni, facts inconsistent with his statement. Therefore, they were relevant to establish that he may have lied about the extent of his involvement in the murders and underlying burglary.

■ Defendant's claim that the shoeprint evidence was too speculative is also meritless.

Lack of positive identification goes to the weight of evidence, not its admissibility. *Atwood*, 171 Ariz. at 643, 832 P.2d at 660; *see also State v. Amaya–Ruiz*, 166 Ariz. 152, 167–69, 800 P.2d 1260, 1275–77 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). The trial court did not abuse its discretion.

### Proof of the Predicate Felony

■ At trial, defendant moved for a directed verdict on the felony murder charge, arguing that the state failed to prove the predicate crime of burglary. *See* Rule 20(a), Ariz.R.Crim.P. He claims that nothing established his entry into the house with an intent to steal.

■ A judgment of acquittal is appropriate only when there is no substantial evidence to support a verdict. *State v. Landrigan*, 176 Ariz. 1, 4, 859 P.2d 111, 114, *cert. denied*, 510 U.S. 927, 114 S.Ct. 334, 126 L.Ed.2d 279 (1993). A burglary occurs when a person enters or *remains* unlawfully in a residential structure with the intent to commit a theft. A.R.S. § 13–1507. Defendant admitted that he formed the intent to steal the microwave while in the apartment. Having decided to do so, he thereafter remained unlawfully on the premises. Moreover, the jury could have disbelieved defendant's statement and reasonably concluded that he formed the intent to steal before entering the women's home. We find that the trial court did not err in denying the motion for directed verdict.

### Proof the Murders Occurred "In Furtherance" of the Burglary

■ Defendant also claims there was insufficient evidence that these murders occurred in furtherance of the burglary. He asserts that the killings were independent of any other offense.

■ Felony murder occurs when a person commits one of the crimes enumerated in A.R.S. § 13–1105 and "in the course of and in

furtherance of such offense or immediate flight from such offense, such person or another person causes the death of any person." A.R.S. § 13–1105(A)(2). A death is "in furtherance" when it results "from any action taken to facilitate the accomplishment of the [predicate] felony." *State v. Herrera*, 176 Ariz. 21, 29, 859 P.2d 131, 139, *cert. denied*, 510 U.S. 951, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993). This is ordinarily a question to be determined by the trier of fact, *id.*, and reversible error occurs "only where there is a complete absence of probative facts to support the conviction." *State v. Scott*, 113 Ariz. 423, 424–25, 555 P.2d 1117, 1118–19 (1976).

According to defendant's account, one murder occurred before he stole the microwave and the other was unrelated to it. He thus argues that they could not possibly have been in furtherance of the burglary. We need not, however, restrict our inquiry to defendant's factual recitation. The state presented evidence, such as the footprints discussed above, that called into question his veracity. The jurors reasonably could have found that the murders made it possible for him to steal. Viewing the proof in a light most favorable to supporting the verdict, we cannot say that the court erred in denying defendant's motion. *See Atwood*, 171 Ariz. at 596, 832 P.2d at 613.

### The Statute of Limitations

■ Defendant was granted a directed verdict on the underlying burglary charge because the statute of limitations had expired. He argues that this "acquittal" negates his felony murder conviction, reasoning that the dismissal had the same legal effect as a factual determination that he did not commit burglary. There was, however, no judicial finding on the merits, as the trial judge made quite clear. Thus, the dismissal did not operate as an acquittal, and we will not treat it as such.

■ A.R.S. § 13–1105 does not require that the defendant be charged and convicted of the underlying felony. The jury must simply find that the defendant committed or attempted to commit it. Even if the statute of limitations has expired on the predicate offense, a defendant may still be prosecuted for felony murder. *See State v. Dennison*, 115 Wash.2d 609, 801 P.2d 193, 202 (1990) ("[R]unning of the statute ... on the underlying felony is irrelevant...."); *State v. White*, 239 Neb. 554, 477 N.W.2d 24, 25 (1991). Furthermore, there is no limitations period for homicide in Arizona. A.R.S. § 13–107(A). Accepting defendant's argument would effectively impose a time limit on every felony murder case, in direct contravention of legislative intent.

We also do not agree that defendant was placed in double jeopardy when, after dismissal of the burglary charge, the jury was allowed to consider it as the predicate felony for first degree murder. As we have indicated, the dismissal did not act as an acquittal. *See United States v. Scott*, 437 U.S. 82, 97, 98 S.Ct. 2187, 2197, 57 L.Ed.2d 65 (1978) (trial court's dismissal for preindictment delay did not preclude the government from seeking a new trial).

### Propriety of Jury Instructions

Based on the foregoing arguments, defendant also claims it was improper to give a burglary instruction. For reasons previously stated, however, the court did not err. The jury was instructed with respect to burglary as a predicate offense to felony murder, not as a separate crime.

■ Defendant briefly mentions that the accomplice instruction was erroneous. Because he does no more than state that he did not waive this objection at trial, he has effectively waived it here. *See State v. Kemp*, 185 Ariz. 52, 57, 912 P.2d 1281, 1286, *cert. denied*, —— U.S. ——, 117 S.Ct. 117, 136 L.Ed.2d 68 (1996).

### SENTENCING ISSUES

■ In sentencing defendant to death, the trial judge found two aggravating factors:

heinous, cruel or depraved, A.R.S. § 13–703(F)(6); and multiple victims, A.R.S. § 13–703(F)(8). On direct appeal, we conduct an independent review to determine whether the death penalty has been properly imposed. *State v. Fulminante*, 161 Ariz. 237, 254, 778 P.2d 602, 619 (1988), *aff'd*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

### Enmund/Tison Finding

In *Enmund v. Florida*, the United States Supreme Court held that a defendant is death-eligible only if he killed, attempted to kill, or intended that a killing take place. 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982). This rule was broadened in *Tison v. Arizona*, where it was decided that the *Enmund* culpability requirement is satisfied in a felony murder case if the defendant was a major participant in the underlying felony *and* acted with reckless indifference to human life. 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987).

In his special verdict, the trial judge stated:

> The Court finds that Mr. Lacy was more than a casual participant in these offenses under the felony murder rule, that he was a major actor. Mr. Lacy was in the process of doing a burglary at the time of the instant offense. He entered the house. He was there when Miss England was bound and gagged. He was present when Miss Acuna was shot the first time. It was not as though he loaned his car to someone, knowing that person was going to do a burglary.

> Either Mr. Lacy or the accessory was armed with a gun.

> The Court finds a definite major involvement on behalf of Mr. Lacy.

Nowhere did the trial court state that defendant killed, attempted to kill, or intended that a killing take place, nor do we find evidence in the record that would support such a conclusion beyond a reasonable doubt. Therefore, we must determine if, under *Ti-son*, defendant was a major participant in the underlying felony *and* showed reckless indifference to human life.

As indicated, the judge explicitly found sufficient participation in the predicate burglary, and we agree. It is less clear, however, whether the court found reckless indifference to human life or if the evidence here would support such a finding. Granted, the trial judge need not recite any "magic words" in making a determination under *Enmund/Tison*. It is the substance of the finding, rather than its label, that is significant. *State v. Runningeagle*, 176 Ariz. 59, 64, 859 P.2d 169, 174 (1993). This special verdict, however, falls short of demonstrating that the court found or even sought to find reckless indifference. Although the judge stated that defendant was "there when Miss England was bound and gagged," the evidence is insufficient to support this conclusion beyond a reasonable doubt. According to defendant's statement, he was not present when Stubblefield bound and gagged Susan; he only witnessed the shooting afterwards. There is almost no other evidence indicating what defendant may have seen, known, or done. At best, the special verdict seems to imply reckless indifference from his mere presence during the homicides, and therein lies its weakness.

The state essentially argues that defendant, during the killings and events leading up to them, stood by and did nothing. He "took no steps to help the girls," "made no effort to summon help," and was concerned only with stealing the microwave. In almost every felony murder case, however, there is a failure by the defendant to stop and render aid or call for help. There must be something more if the concept of "reckless indifference" is to provide any meaningful guidance for determining which defendants should suffer the ultimate penalty. In *Tison*, for example, the Court observed that reckless indifference may be implicit when one "knowingly engag[es] in criminal activities known to carry a grave risk of death." 481 U.S. at 157, 107 S.Ct. at 1688. The defen-

352

dants there "both subjectively appreciated that their acts were likely to result in the taking of innocent life." *Id.* at 152, 107 S.Ct. at 1685.

Here, other than what defendant described, there is little to establish his involvement in the deaths of these young women. We know that, at a minimum, he stole a microwave after one of the murders and did nothing to prevent either victim's death. While this may demonstrate callousness and a shocking lack of moral fiber, it does not alone rise to the level of reckless indifference. Equally inconclusive is the shoeprint found in the victims' bedroom, suggesting that defendant was not entirely truthful in his statement and may have been close enough to one of the bodies to have stepped in blood. Even assuming, however, that the shoeprint was his, its existence does not establish defendant's mental state, nor does it tell us when he may have entered the bedroom.

As other courts have found, it is problematic to conclude beyond a reasonable doubt that a defendant exhibited reckless indifference when there are multiple suspects, no eyewitnesses, and minimal physical evidence. For instance, the Tennessee Supreme Court reversed a death sentence where no evidence showed that the defendant ever possessed a weapon during a robbery/murder or that he personally confined the victim at any point during the robbery. *Tennessee v. Branam,* 855 S.W.2d 563 (Tenn.1993). Even though he knew his accomplice was armed, nothing established his mental state as reckless indifference. *Id.* at 571.

Similarly, in *Jackson v. Florida,* 575 So.2d 181 (Fla.1991), the defendant was identified at the scene of the murder, he had previously indicated his intent to rob the victim, evidence showed his brother was also at the scene, and there were no eyewitnesses to the actual killing. He was convicted of felony murder and sentenced to death. The Florida Supreme Court reversed that sentence because, although defendant was a major participant in the underlying felony, there was insufficient proof of a reckless disregard for human life. The court noted an absence of evidence that he possessed or fired a weapon, harmed the victim, intended harm when he entered the store, or expected violence to erupt. *Id.* at 192–93. Furthermore, the court found that there was no chance to prevent the murder because it happened quickly. *Id.*

■ We do not suggest that defendant's tale must be accepted at face value. Without his statement, however, we are left with an almost complete void as to what occurred that night. His fingerprints were nowhere to be found, it is unclear whether he knew Stubblefield had a gun, and it is uncertain that he should have anticipated violence. *Cf. State v. Miles,* 186 Ariz. 10, 16, 918 P.2d 1028, 1034 (1996) (finding reckless indifference where defendant held a gun on the victim at one point during her abduction and admitted knowing beforehand co-defendant's intention to kill); *State v. Salazar,* 173 Ariz. 399, 413, 844 P.2d 566, 580 (1992), *cert. denied,* 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993) (finding reckless indifference where defendant left fingerprints in what appeared to be blood and there were fresh scratches on his chest). This case is distinguishable from *State v. Robinson,* relied on by the state. There, the co-defendant was armed when he went to the victims' home to steal and admitted knowing beforehand that "it might be necessary to kill the residents if difficulty was encountered." 165 Ariz. at 61–62, 796 P.2d at 863–64. While a risk of bloodshed may exist during the commission of any felony, mere participation in a crime resulting in a homicide is not enough to warrant imposition of the death penalty. *Jackson,* 575 So.2d at 191 (citing *Tison,* 481 U.S. at 151, 107 S.Ct. at 1684). To give defendant a capital sentence on such facts

> would qualify every defendant convicted of felony murder for the ultimate penalty. That would defeat the cautious admonition of *Enmund* and *Tison,* that the constitution requires proof of culpability great enough to render the death penalty proportional punishment....

*Id.* at 193.

■ Utilizing what it calls the "only logical inference from the evidence," the state

posits a highly inculpatory version of the events that night. However, it is just one, and not surprisingly the most abhorrent, of many viable scenarios. A mere *possibility*, or even the likelihood, that defendant exhibited reckless indifference is insufficient. Such a finding must be made beyond a reasonable doubt. Because the evidence does not permit that here, defendant's death sentences cannot be upheld under the strict requirements of *Tison.*

### *(F)(8) Aggravating Factor*

■■■ There is yet another defect in these sentences. The trial court specifically relied on a statutory aggravator that did not exist when the crimes in question were committed. *See* A.R.S. § 13–703(F)(8) (Laws 1984, Ch. 66, § 1)(conviction "of one or more other homicides, . . . which were committed during the commission of the offense"). The state concedes this error but asserts that we should simply substitute either subsection (F)(1) (conviction "of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable") or former (F)(2) (previous conviction "of a felony in the United States involving the use or threat of violence on another person"), both of which existed in 1982. We do not find the issue to be quite so simple. Moreover, we note that in its sentencing memorandum dated June 10, and at the subsequent sentencing hearing on June 14, 1993, the state cited only (F)(6) and (F)(8) as applicable aggravators, although it had previously listed (F)(1) as an additional possibility in its disclosure statement of May 3, 1993. Thus, even if we were to consider substitution proper, the state might be deemed to have waived its present position.

The defense argues that if these subsections are interchangeable, there can be no explanation for the legislature's subsequent enactment of (F)(8). It would have been, according to defendant, redundant and therefore unnecessary. The state responds that the intent behind (F)(8) was not to fill a void left by (F)(1) and (F)(2) with respect to "contemporaneous murders or convictions," but

rather to address this court's refusal to allow the (F)(3) aggravating factor ("defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense") in situations where the perpetrator actually intended to kill multiple victims. It cites *State v. McCall,* 139 Ariz. 147, 161–62, 677 P.2d 920, 934–35 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984), as an example, and offers as additional support minutes of the Arizona Prosecuting Attorneys' Advisory Council, which apparently proposed (F)(8) to the legislature.

We need not enter this fray. Regardless of what may have been the sponsor's intention, (F)(8) plainly refers to "other homicides" committed "during the commission of the offense." Thus, it specifically addresses contemporaneous killings, something done by no other statutory aggravating factor. Moreover, the trial court here expressly found that neither (F)(1) nor (F)(2) was applicable. While it might be argued that this was due to the judge's misplaced reliance on (F)(8), a reading of the special verdict suggests otherwise. Only in discussing the (F)(3) factor did the court note that a "double homicide" was "covered in another provision," an obvious reference to (F)(8). Nothing in the record suggests that the court chose not to apply (F)(1) or (F)(2) because they were "covered" elsewhere.

■■■ We are unwilling to accept the state's suggestion that we should substitute an aggravator of our own choosing for one that has been eliminated. While we are charged with the duty of reviewing and, where appropriate, reweighing the various factors relied on by the trial court in imposing a death sentence, we are uncomfortable with any process permitting the *de novo* application of statutory aggravators on appeal. It is for the trial court to make such determinations in the first instance, following proper notice to the defendant, Rule 15.1(g)(2), Ariz.R.Crim.P., and an opportunity to be heard, A.R.S. §§ 13–703(B) and (C).

We decline to address defendant's contention that subsections (F)(1) and (F)(2) were

intended to apply only to "prior convictions, which are separated by time and space from the offense for which he is now being considered for the death penalty." The issue before us, and the only one on which we requested supplemental briefing, is "whether the § 13–703(F)(8) aggravating factor can be applied in this case." The answer to that question is plainly in the negative.

### Heinous, Cruel or Depraved

■ The trial court made the following findings with respect to the (F)(6) aggravating factor in its special verdict of June 14, 1993:

As to A.R.S. § 13–703(F)(6), the Court finds that Ms. England had been tied with a telephone cord, gagged and hit on her head with an object such as a gun. The Court further finds that the murder of Ms. England was senseless, Ms. England was helpless, she could in no way defend herself, and there were multiple gunshot wounds.

As to A.R.S. § 13–703(F)(6), the Court finds on Count Two as to Miss Acuna that there is insufficient evidence for a finding of cruelty, heinous, cruel or depraved, other than the offense was senseless and the victim was helpless.

We have held that senselessness and helplessness, without more, will not ordinarily support a finding of heinousness or depravity. *Miles*, 186 Ariz. at 18, 918 P.2d at 1036. Additionally, because the trial court found no basis for a cruelty finding with respect to Teresa Acuña's killing, the (F)(6) factor cannot apply to this count.

■ We agree with the state that there is sufficient evidence in this record to support the finding that Susan's murder was especially cruel. Testimony from the medical examiner strongly suggested that the blow to her head did not render her unconscious. Defendant's statements about the struggle he witnessed further support this conclusion. This young woman clearly suffered both mental and physical pain.

Again, however, the trial court's finding of senselessness and helplessness falls short of the mark with respect to heinousness and depravity. Although the court mentions "multiple gunshot wounds," the record does not contain enough evidence to support a finding beyond a reasonable doubt of gratuitous violence, as argued by the state. The medical testimony did not establish which of the three shots was fatal, and therefore we cannot determine if there were injuries inflicted beyond those necessary to cause death. *See State v. Jones*, 185 Ariz. 471, 488, 917 P.2d 200, 217 (1996). We are, however, able to uphold the (F)(6) factor with respect to Susan's killing on the basis of the cruelty finding alone, *see State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995), *cert. denied*, — U.S. ——, 116 S.Ct. 2535, 135 L.Ed.2d 1057 (1996), and we do so.

### Testimony of the Victims' Family Members

■ At the sentencing hearing, the court heard from Teresa Acuña's father and Susan England's brother. The latter indicated that his sister had been active in Amnesty International and was opposed to the death penalty. He further expressed a preference that defendant not be put to death "in my sister's name." He asked instead that the judge incarcerate the defendant "for as long as you can." Mr. Acuña, while acknowledging that the decision was up to the judge, also expressed personal reservations about the death penalty. Although we understand defendant's desire that this testimony be considered by us, *see State v. Haight*, 98 Ohio App.3d 639, 649 N.E.2d 294, 316 (1994), we have recently held that it is not relevant mitigation because it says nothing about him or his crime. *State v. Williams*, 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995). We choose not to revisit this ruling.

### DISPOSITION

We have considered all of the issues raised by defendant on appeal and affirm his convictions. This case was briefed and argued before the repeal of A.R.S. § 13–4035. *See*

1995 Laws, Ch. 198, § 1; *Kemp*, 185 Ariz. at 67 n. 1, 912 P.2d at 1296 n. 1. Thus, we have reviewed the record for fundamental error and found none.

A.R.S. § 13–703.01 reflects a strong legislative preference that we not remand for resentencing because of the errors we have identified. Moreover, we are persuaded that based on the record before us there can never be an *Enmund/Tison* finding made beyond a reasonable doubt. This, coupled with the fact that we are left with only one aggravating factor on the England count, and none on the Acuña count, leads us to reduce both sentences to life imprisonment. *See* former A.R.S. § 13–703(A)("imprisonment ... without possibility of parole until the completion of the service of twenty-five calendar years"). Due to the helplessness of the victims, the senselessness of the murders, and the cruelty suffered by Susan England, however, we order the terms to run consecutively. *See* former A.R.S. § 13–708 (requiring concurrent sentences unless court expressly directs otherwise).

FELDMAN, C.J., and MOELLER, MARTONE and CORCORAN (Retired), JJ., concur.