IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

THE STATE OF ARIZONA, )
) 2 CA-CR 2005-0219
Appellee, ) DEPARTMENT B
)
v. ) O P I N I O N
)
CYNTHIA D. JOHNSON, )
)
Appellant. )
)

APPEAL FROM THE SUPERIOR COURT OF PINAL COUNTY

Cause No. CR200400309

Honorable Gilberto V. Figueroa, Judge

AFFIRMED IN PART AND REVERSED IN PART

Terry Goddard, Arizona Attorney General
  By Randall M. Howe and Joseph T. Maziarz                          Phoenix
                                                       Attorneys for Appellee

Harriette P. Levitt                                                  Tucson
                                                     Attorney for Appellant

E S P I N O S A, Judge.

¶1          Twelve jurors found appellant Cynthia Johnson guilty of first-degree felony murder and conspiracy to commit kidnapping. At the state's request, the trial court dismissed a third count charging Johnson with first-degree burglary. After denying Johnson's motion for new trial, filed pursuant to Rule 24.1, Ariz. R. Crim. P., 17 A.R.S., the trial court

sentenced her to life in prison for the murder conviction and to a concurrent, presumptive, 10.5-year term for the conspiracy conviction. In the single issue raised on appeal, Johnson contends there was insufficient evidence to sustain the jury's verdict on the felony murder charge. Because we find the evidence does not show Johnson was an accomplice to the predicate offense charged, we must reverse her conviction for felony murder.

¶2 A conviction must be based on substantial evidence, Rule 20(a), Ariz. R. Crim. P., 17 A.R.S., which is proof that reasonable persons could find "sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears*, 184 Ariz. 277, 290, 908 P.2d 1062, 1075 (1996). We will not reverse a conviction for insufficient evidence unless "there is a complete absence of probative facts to support [the jury's] conclusion." *State v. Mauro*, 159 Ariz. 186, 206, 766 P.2d 59, 79 (1988); *see also State v. Carlisle*, 198 Ariz. 203, ¶ 11, 8 P.3d 391, 394 (App. 2000). Stated differently, to warrant reversal, "it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo*, 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987). "In considering the sufficiency of the evidence, we evaluate the entire record, including Appellant's testimony." *State v. Alvarado*, 178 Ariz. 539, 541, 875 P.2d 198, 200 (App. 1994).

¶3 To prove first-degree felony murder as defined in A.R.S. § 13-1105(A)(2), the state must show that the defendant, acting either alone or with others, committed or attempted to commit any of the specific felony offenses listed in § 13-1105(A)(2) and, "*'in the course of and in furtherance of' that felony*, the defendant or another person caused the

2

death of any person." *State v. Phillips*, 202 Ariz. 427, ¶ 39, 46 P.3d 1048, 1057 (2002), *quoting* § 13-1105(A)(2) (emphasis supplied in *Phillips*). Among the felony offenses listed is burglary, and the indictment against Johnson alleged first-degree burglary as the specific predicate offense. The jury was instructed that, to prove first-degree murder, the state had to "prove that the defendant, whether as a principal or an accomplice, committed or attempted to commit First Degree burglary and that someone was killed in the course of and in furtherance of that offense." First-degree burglary is defined in A.R.S. § 13-1508(A) as follows: "A person commits burglary in the first degree if such person or an accomplice violates the provisions of either § 13-1506 [defining third-degree burglary][1] or 13-1507 [defining second-degree burglary][2] and knowingly possesses explosives, a deadly weapon or a dangerous instrument in the course of committing any theft or any felony."

**Facts**

¶4        Viewed in the light most favorable to sustaining the verdict, *see Arredondo*, 155 Ariz. at 316, 746 P.2d at 486, the evidence presented at trial established that, on the night of September 10, 2003, the murder victim, Tom Snyder, and his wife, Marilyn, were asleep in their bedroom when they were awakened by two intruders standing near their bed. One of the intruders instructed the couple to "[t]urn over and put [their] faces in the pillow." Tom

---

[1]Section 13-1506(A)(1), A.R.S., provides that a person commits third-degree burglary by "[e]ntering or remaining unlawfully in or on a nonresidential structure or in a fenced commercial or residential yard with the intent to commit any theft or any felony therein."

[2]Section 13-1507(A), A.R.S., provides that a person commits second-degree burglary "by entering or remaining unlawfully in or on a residential structure with the intent to commit any theft or any felony therein."

"jumped up" to get out of bed and was immediately shot. He sustained a total of four gunshot wounds and was also stabbed multiple times as he struggled with the intruders. He nonetheless managed to "r[u]n them out of the [bed]room" before collapsing on the living room floor, mortally wounded. The two assailants proved to be fifteen-year-old Allen Pacheco and his seventeen-year-old brother Johnny.

¶5     Tom and Marilyn have a son, Nathan, who in September 2003 was twenty-two years old. Cynthia Johnson had known Nathan for years, considered him a family friend, and had recently allowed Nathan to live with her family for a time.[3] Johnson's family consisted of herself, her longtime boyfriend Todd, and their three children, whose ages at the time of trial were eleven, eight, and three.

¶6     On Tuesday, September 9, the day before the murder, a distraught Johnson had gone to Nathan's parents' home, awakening Tom and Marilyn at 5:00 a.m. to tell them she believed Nathan had molested her then-nine-year-old daughter the night before. When the alleged molestation occurred, Johnson and Todd had gone out for the night, leaving Allen Pacheco, a friend of Nathan's, to babysit their children.

¶7     On Wednesday night, September 10, eight people in two vehicles drove to the home of Nathan's parents, looking for Nathan. Johnson drove a van with three male

_____

[3]Nathan is apparently a troubled young man who had caused problems for his parents since he was a teenager. He had not graduated from high school and "definitely was not succeeding" in life. His mother described him to one of the investigating officers as "a thief, a druggie, and a liar." After being "kicked out" of the family home by his parents, Nathan would sometimes stay in their enclosed back porch or in a shed in their backyard, but he was essentially homeless.

passengers; four other males, including Allen and Johnny Pacheco, rode together in a car. The men believed Nathan had stolen a bicycle that belonged to one of them, and recovering the bicycle was among the reasons for going to Nathan's parents' home to look for him. Another was Johnson's desire to avenge the molestation of her daughter. Johnson later told officers that she had spent "probably twelve hours" unsuccessfully looking for Nathan on Tuesday and that "[other] people were out looking for [him]" as well.

¶8 Johnson believed Nathan was again living in a shed in his parents' backyard. As she later told officers, the plan on Wednesday night was for the men to "go in the back yard, look in the shed, get Nathan, . . . lure him out," "put him in the van and . . . hold him until we got to the house" where she and others would then "beat him up. . . . [W]e were gonna kick his ass."

¶9 Only one of the seven young men testified at trial. Wayne Besenhofer, one of Johnson's three passengers, testified that, on the way to the victims' home, conversation in the van had turned to Nathan's alleged molestation of Johnson's daughter. A "very upset," "very agitated and very livid" Johnson said they were "going to get this guy [and hurt him] because he [had] hurt her daughter." Johnson detailed the plan that called for Allen to lure Nathan to the front of the house and for the others then "to get out and grab him and throw him in the . . . back of the van." According to Besenhofer, Nathan would supposedly be "out back, in the back of the house, either in a shed or on the back porch or somewhere," waiting for Allen as Nathan and Allen had prearranged.

5

¶10 As it happened, however, Nathan was not there. While Johnson waited in the van, Allen signaled the other six males to assemble outside the house. At least four of the seven were armed with some kind of weapon. After failing to find Nathan in the yard, the shed in the backyard, or the enclosed back porch, all seven returned to the carport. There they tried a door leading into the house and found it locked. Allen broke a window in the door, reached in, and unlocked the door, through which all seven men then entered the home.

¶11 After the group quickly determined Nathan was not inside, Allen and Johnny Pacheco entered the sleeping victims' bedroom. Armed with a gun one of the other men had brought, Allen yelled at the victims, causing Tom to jump up, and Allen "then just started shooting." Four of the men immediately ran from the house, and three of them got into the waiting van. At different points, Johnson asked what had happened, where Allen was, and "did you get [Nathan]?" After driving around the victims' neighborhood briefly, Johnson drove the van and her passengers back to her house.

¶12 In subsequent days, police detectives interviewed Johnson twice, the second time after other detectives had interviewed Allen and Johnny Pacheco. Johnson was initially dishonest but eventually admitted having driven the van to the victims' home and having waited in the vehicle, expecting the men to return with Nathan and "throw him in the back" of the van.

**Discussion**

¶13      Johnson concedes she participated in a conspiracy to kidnap Nathan but contends she had no role whatever in the burglary of his parents' home. She maintains the plan to kidnap Nathan assumed he would be found either in the shed in his parents' backyard or in the yard itself; thus, "[Johnson]'s conspiracy consisted of a plan to kidnap Nathan from a totally different structure than [his parents'] home." Because she neither planned, intended, nor participated in the burglary of the Snyders' home, Johnson claims the evidence was insufficient to sustain her conviction for felony murder. The state counters that it was not required to prove Johnson knew her accomplices would enter the victims' home, only that she intended they "commit *any* burglary on the Snyder property, and that one or more of them was armed with a deadly weapon *or* dangerous instrument."

¶14      The offense of felony murder does not require that the defendant have been charged with and convicted of the underlying predicate felony. "The jury must simply find that the defendant committed or attempted to commit it." *State v. Lacy*, 187 Ariz. 340, 350, 929 P.2d 1288, 1298 (1996); *see also State v. Eastlack*, 180 Ariz. 243, 258, 883 P.2d 999, 1014 (1994). Because Johnson did not personally commit a burglary on the Snyder property, the state correctly concedes that she was, at most, an accomplice to a burglary. As defined in A.R.S. § 13-301, an accomplice is one

> who with the intent to promote or facilitate the commission of
> an offense:
>
>     1. Solicits or commands another person to commit the
> offense; or

7

2. Aids, counsels, agrees to aid or attempts to aid another person in planning or committing the offense[; or]

3. Provides means or opportunity to another person to commit the offense.

The state was thus required to prove that Johnson had intentionally aided or attempted to aid others in planning or committing first-degree burglary.[4] *See Lacy*, 187 Ariz. at 350, 929 P.2d at 1298.

**¶15** Although Johnson has not cited them, we find three supreme court cases dispositive of her appeal: *State v. Wall*, 212 Ariz. 1, 126 P.3d 148 (2006); *Evanchyk v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (2002); and *State v. Phillips*, 202 Ariz. 427, 46 P.3d 1048 (2002). In *Phillips*, the court rejected the state's argument that "a defendant [is] liable for *all* acts of an accomplice as long as the defendant aided the accomplice in planning or committing *any* related offense." 202 Ariz. 427, ¶ 35, 46 P.3d at 1056. Instead, the court held A.R.S. § 13-303(A)(3) imposes accomplice liability upon a defendant only for the specific offenses the defendant "intended to aid or aided another in planning or committing." 202 Ariz. 427, ¶ 37, 46 P.3d at 1057. As the court stated in *Evanchyk*, which it decided contemporaneously with *Phillips*, a defendant cannot "be convicted of felony murder

---

[4]The state notes it "could (and should)" have alleged as predicate offenses burglary under A.R.S. §§ 13-1506, 13-1507, or 13-1508, as well as kidnapping under A.R.S. § 13-1304, but acknowledges that, "having chosen to allege only first degree burglary as the predicate offense, the State was limited to that theory when the case was submitted to the jury." *See generally State v. Sanders*, 205 Ariz. 208, ¶¶ 16-21, 68 P.3d 434, 439-40 (App. 2003).

8

committed by a codefendant unless [the defendant] was both an accomplice and a participant in the underlying felony." 202 Ariz. 476, ¶ 14, 47 P.3d at 1118.

¶16 Refining the test still further in its recent decision in *Wall*, the court underscored that "reasonable foreseeability is not the test for accomplice responsibility in Arizona." 212 Ariz. 1, ¶ 21, 126 P.3d at 152. "[I]t is the intent of the one charged as an accomplice, rather than the intent of the main actor, that controls the accomplice's criminal responsibility." *Id.* ¶ 20. In short, Johnson can be held responsible for felony murder only if Tom Snyder's death resulted "'in the course of and in furtherance of'" the specific burglary she intended to facilitate or commit. *Phillips*, 202 Ariz. 427, ¶¶ 39, 41, 46 P.3d at 1057, *quoting* § 13-1105(A)(2).

¶17 What neither party has articulated clearly on appeal is that at least two separate, first-degree burglaries were committed on the night of September 10, 2003.[5] The first occurred when the seven men, several of whom were armed, entered the Snyders' fenced backyard. *See State v. Bottoni*, 131 Ariz. 574, 575, 643 P.2d 19, 20 (App. 1982) ("[T]he crime of burglary is complete when entrance to the [residential yard] or structure is made with the requisite criminal intent. Burglary does not require the successful completion of the underlying felony.") (citation omitted); *see also State v. Taylor*, 25 Ariz. App. 497, 499, 544 P.2d 714, 716 (1976) (essence of burglary is entry with requisite intent). The second

---

[5]Pursuant to A.R.S. § 13-1508, what would otherwise have been a second-degree burglary of the Snyders' home, *see* A.R.S. § 13-1507, and a third-degree burglary of their yard or shed, *see* A.R.S. § 13-1506, both became first-degree burglaries because some of the men were armed with a deadly weapon or dangerous instrument.

occurred when the men forced their way into the Snyders' home.[6] Not only was their entry into the house a separate and distinct burglary from their entry into the backyard and shed but, crucially, it was the burglary "in the course . . . and . . . furtherance of [which]" the murder of Tom Snyder occurred. § 13-1105(A)(2).

¶18 At oral argument, the state for the first time advanced the concept of a "single, overarching" burglary offense, which it claimed was the predicate felony alleged by the nonspecific reference to first-degree burglary in the felony murder count of the indictment. Such a generalized offense, it asserted, broadly encompassed any of the various entries made on the Snyder property and supplied a sufficient predicate for the felony murder charge. But we find no statutory support for the state's contention and therefore reject it. The burglary statutes define no such unified or "overarching" burglary offense. Instead, they distinguish between nonresidential structures and fenced commercial or residential yards, on the one hand, *see* § 13-1506(A), and residential structures on the other, *see* § 13-1507(A). They distinguish as well between armed and unarmed entries. *See* § 13-1508. And the felony murder statute preserves those distinctions by referring to the included predicate offenses as "burglary under § 13-1506, 13-1507 or 13-1508." § 13-1105(A)(2).

¶19 It is certainly possible that Cynthia Johnson, infuriated about what she believed Nathan had done to her nine-year-old daughter, might well have directed the seven men she and her boyfriend had recruited to hunt everywhere for Nathan until they found him,

---

[6]Whether the men committed a third discrete burglary by actually entering the shed in the backyard or whether they determined simply by looking into it that Nathan was not inside depends upon an unresolved factual question we need not address.

10

regardless of where on the Snyders' property he might be. Johnson might in that case have been an accomplice to the separate burglary of the Snyder home during which Tom Snyder was killed. But, after scouring the trial court record, we have been unable to find any reasonable evidence to support that essential finding.

¶20 Johnson testified at trial that she had never planned with the seven men to break into the Snyders' house. Both Nathan and his father had told her Nathan "stayed in the shed in the backyard, not in the house," and Johnson claimed Allen Pacheco had prearranged with Nathan to meet him in the backyard of the Snyder home. Nathan was to leave the gate open for Allen and be waiting for him in the yard. According to Johnson, the men were never supposed to enter the Snyders' house, and she would have expressly instructed them not to had she known they might.

¶21 Johnson's trial testimony was consistent with her earlier statements to police officers in a pre-arrest interview five days after the murder. Johnson had insisted then that there had been no plan to enter the Snyders' home and that the only plan was to lure Nathan from the backyard or the shed out to the street and into Johnson's van. Although she knew Tom Snyder had guns "all over his house," Johnson stated she had never thought to tell the seven men that "[be]cause they weren't supposed to be going in the house."

¶22 The only witness called at trial who could have contradicted Johnson instead supported her testimony. Wayne Besenhofer testified that the plan that night had called for Nathan to be waiting outside for Allen, who was supposed to go get Nathan and bring him out to the front of the house where the other six men would "grab him and throw him in the

11

back . . . of the van." When Allen did not find Nathan initially, he signaled the others to join him. Besenhofer testified that, after they then failed to find Nathan in the yard, the shed, or an enclosed porch connected to the house that Besenhofer called an "add-on," they all proceeded to the carport where Allen broke the window in the door through which they gained entry to the house. Besenhofer testified he was unaware of any preexisting plan to break into the house—in part because Nathan was supposed to be waiting outside for Allen. Besenhofer described their entry into the Snyders' home as having happened on the "spur of the moment."

¶23 At oral argument, the state maintained there was evidence showing Johnson had knowledge of a preexisting plan to enter the Snyders' home, pointing to a single remark Johnson made in the second of her two recorded statements to police detectives. Johnson had said: "I was in a blue van. And they said, '[Y]ou'll see us come out the door.'" On cross-examination at trial, she acknowledged having said "door" but explained she had meant a "gate or a door," impliedly referring to the entrance to the backyard. On redirect examination, she testified she had simply confused the two terms "because there was never a door involved except for the shed."

¶24 Because the state apparently believed it only needed to prove Johnson was an accomplice to the burglary of the shed in order to establish the requisite predicate felony, the jury was not asked to determine whether Johnson was also an accomplice to the separate burglary of the Snyder residence. Given the marked lack of any other evidence that Johnson intended or envisioned that anyone would enter the house in search of Nathan, we are not

12

persuaded that her one isolated reference to a "door" would have carried as much weight as the state claims or convinced the jury that Johnson had also been an accomplice to the burglary of the home. As noted above, Wayne Besenhofer testified without contradiction that breaking into the house had been entirely unplanned and had occurred spontaneously.

¶25        In short, although Johnson planned and intended to aid the first burglary of the backyard and shed, there was simply no substantial evidence from which a reasonable jury could have concluded that she knew, intended, or even expected that the seven men might also burglarize the Snyders' home in search of Nathan. *See State v. Spears*, 184 Ariz. 277, 290, 908 P.2d 1062, 1075 (1996) (conviction must be supported by substantial evidence). The state did not argue otherwise in its brief. Believing it needed to prove only that Johnson had been an accomplice to the burglary of the shed, the state simply did not address the lack of evidence that she was an accomplice to the separate burglary of the house.[7] Because it was the latter burglary during which the murder occurred and there was no substantial evidence Johnson intended to facilitate the commission of that particular offense, her conviction for felony murder cannot stand. *See Wall*, 212 Ariz. 1, ¶¶ 20-21, 126 P.3d at 152; *Evanchyk*, 202 Ariz. 476, ¶ 14, 47 P.3d at 118; *Phillips*, 202 Ariz. 427, ¶ 37, 46 P.3d at 1057.

---

[7]Whether it is telling or merely coincidental, just before the court instructed the jury, the state requested dismissal of the count in the indictment that charged Johnson with first-degree burglary. It is true that felony murder does not require the defendant to be charged with and convicted of the predicate felony; still, the jury "must . . . find that the defendant committed or attempted to commit it." *State v. Lacy*, 187 Ariz. 340, 350, 929 P.2d 1288, 1298 (1996). Although the reasons for the state's decision to request dismissal are neither evident from the record nor were they supplied at oral argument, the dismissal appears to lend additional support to Johnson's argument.

13

¶26     At most, Johnson aided the commission of the residential burglary only after the fact, by driving some of the participants from the scene, failing to call the police after she learned what had happened, and lying to police officers initially about the extent of her knowledge and involvement. Her knowing role in the second burglary thus began only after the offense had already been committed. However, "[t]o be an accomplice, a person's first connection with a crime must be prior to, or during, its commission; it cannot be after the commission of the offense." 21 Am. Jur. 2d *Criminal Law* § 205 (1998). And the liability of an accessory after the fact is clearly different from that of a principal or an accomplice. *State v. Hill*, 26 Ariz. App. 37, 38, 545 P.2d 999, 1000 (1976).

¶27     Johnson was clearly an accomplice to the first burglary of the Snyders' backyard—while intending to aid in the commission of that burglary with the goal of kidnapping Nathan, she drove some of the perpetrators to the victims' home, waited during the commission of the burglary, drove several accomplices away from the scene, and helped to conceal their participation in the crime. Because there was no similar evidence that she intended the second burglary to occur or intended beforehand to facilitate its commission, Johnson was at most an accessory after the fact to that offense. Had she been criminally charged in relation to the second burglary, which she was not, the appropriate charge would have been hindering prosecution in violation of A.R.S. §§ 13-2510, 13-2511, or 13-2512, the statutory embodiment of the "distinct, independent," common-law offense of being an accessory after the fact. *State v. Hughes*, 189 Ariz. 62, 74, 938 P.2d 457, 469 (1997).

14

## Disposition

¶**28**      The absence of any substantial evidence that Johnson was an accomplice to the first-degree burglary of the Snyder residence requires us to reverse her conviction for felony murder and vacate the attendant sentence of life imprisonment. Her conviction and sentence for conspiracy to commit kidnapping are affirmed.[8]


_____
PHILIP G. ESPINOSA, Judge

CONCURRING:


_____
PETER J. ECKERSTROM, Presiding Judge


_____
J. WILLIAM BRAMMER, JR., Judge

_____

[8]Pursuant to A.R.S. § 13-709(B), Johnson was entitled to receive presentence incarceration credit on both of her concurrent sentences. She remains entitled to that credit on her conspiracy sentence.