746 P.2d 484

STATE of Arizona, Appellee,

v.

Victor Manuel ARREDONDO, Appellant.

No. CR–86–0163–AP.

Supreme Court of Arizona, En Banc.

Dec. 3, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Georgia B. Ellexson, Diane M. Ramsey, Asst. Attys. Gen., Phoenix, for appellee State.

Dean W. Trebesch, Maricopa County Public Defender, Ross P. Lee, Former Maricopa County Public Defender by James H. Kemper, Deputy Maricopa County Public Defender, Phoenix, for appellant Arredondo.

MOELLER, Justice.

## JURISDICTION

Victor Manuel Arredondo (defendant) was charged with having conspired with co-defendant Felipe Gonzales to murder Encarnacion Rivera. A jury found him guilty as charged. Pursuant to A.R.S. § 13–1003(D), the trial court imposed a sentence of life imprisonment. The single issue raised on appeal is the sufficiency of the evidence to support the verdict. This court has jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 12–102, 13–4031, and –4033. We affirm because we conclude the evidence is sufficient to support the verdict and because our review of the entire record shows no reversible error.

## FACTS

Because defendant challenges the sufficiency of the evidence, we set forth the facts in some detail. At 6:30 a.m., on March 9, 1985, police officers arrived at 417 North Ninth Street in Phoenix and found the victim Encarnacion Rivera, whose nickname was "the bootlegger," outside his house leaning on the hood of a vehicle. He was holding two handguns and bleeding profusely. He stated that "two young punks," whom he described as Hispanic males, had shot him. Shortly thereafter, he died from shotgun wounds to the chest and abdomen.

Police recovered several shotgun shells at the scene. Later, pursuant to a search warrant, they seized three shotguns and some shells with No. 6 shot from the home of Felipe Gonzales' parents. The precise murder weapon was never identified. Physical evidence uncovered during the investigation showed that a shotgun had been fired from the outside through the front door of the victim's home and that handguns of two different calibers had been fired from inside the home. These physical findings were never released to either the public or the media.

A principal witness at trial was Laz Sanford. Sanford had spent the evening before the homicide drinking beer with a coworker. The two of them ended up at a party at Felipe Gonzales' house where Sanford fell asleep on a couch in the living room. Sanford was awakened when he heard Gonzales and defendant talking excitedly in the adjacent kitchen. Gonzales and defendant had earlier attempted either to steal or buy beer from the victim and an altercation had ensued. Sanford then heard Gonzales say to the defendant that the victim had shot at them and that they were going back to the victim's apartment to get revenge. To this, the defendant responded, "Yes." Gonzales then said to the defendant, "This is how you load the gun ... you pull this hammer back and you put the shells in here." Sanford heard what he believed to be the clicking sound of a single-barrel shotgun being opened and heard defendant reply, "I see." Sanford heard some other conversation indicating to him that the shells being discussed contained No. 6 shot.

Sanford then saw the defendant and Gonzales leave the house together, with Gonzales carrying the shotgun. Sanford drifted back to sleep and was still on the couch approximately thirty minutes later when the two returned. Sanford then heard Gonzales say that he, Gonzales, had fired twice through the victim's front door. When Gonzales said, "I went boom and we got revenge tonight," defendant said, "Yeah." Gonzales told defendant that he wished defendant had been with him on the victim's porch and defendant replied that he had been at the side of the house. After overhearing these conversations, Sanford left the house. About two weeks later, he learned from a friend that someone had been killed in the incident. Sanford was then living in Phoenix with his sister and her children. He did not report his information to the police at the time because he feared for the safety of the children. However, after he moved to Tucson a few months later he contacted Silent Witness.

After police determined that the information they had obtained from Sanford comported with physical evidence known to them (but unpublished), they decided to question the defendant. When first questioned on August 1, 1985, defendant denied any involvement in the murder, but stated he had learned of it through a newspaper. The interviewing detective knew that there had been no newspaper stories. When the detective confronted defendant with witnesses' statements, he admitted being with Gonzales when the fatal shots were fired. He also made other admissions, some of which were verified by the unpublished physical evidence. The defendant's final statement to the officer was essentially as follows: He and Gonzales went to the victim's apartment to get beer, the victim shot at them, they ran off and returned to Gonzales' apartment. At his apartment Gonzales got a shotgun and he and defendant returned to the victim's apartment where Gonzales fired at the victim through the front door and the victim returned the fire; then defendant ran to his own home. In his statement, defendant acknowledged that he knew what Gonzales planned to do when they went to the victim's apartment the second time.

Notwithstanding his statement to the police, defendant testified at trial that he was at his home at the time of the murder. Additionally he denied visiting Gonzales' apartment that day, denied ever meeting Sanford and denied reading about the murder in the papers. His explanation for his confession to police was that he was scared and had made up the story about his involvement in an attempt to stay out of trouble. He claimed that his confession's accuracy was due to the fact that he was repeating neighborhood gossip about the murder.

## SUFFICIENCY OF THE EVIDENCE

Defendant was charged with conspiracy to commit first degree murder. Therefore, the prosecution was required to prove that, with the intent to promote or aid the commission of the murder, the defendant agreed with Gonzales that one or both of them would engage in conduct constituting the murder. A.R.S. § 13–1003(A); *State v. Newman*, 141 Ariz. 554, 559, 688 P.2d 180, 185 (1984).

On appeal the reviewing court considers the evidence in the light most favorable to sustaining the verdict. *State v. Hall*, 129 Ariz. 589, 593, 633 P.2d 398, 402 (1981). To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury. *People v. Brown*, 272 Cal.App.2d 623, 627, 77 Cal. Rptr. 650, 652 (1969).

Defendant claims that the evidence shows only that he was present with knowledge of Gonzales' intention, but that there was insufficient evidence to support a finding that there was an agreement between himself and Gonzales. The dispositive issue is whether there is enough evidence for a rational trier of fact to conclude that defendant committed conspiracy.

Any action sufficient to corroborate the existence of an agreement to commit the unlawful act and to show that

it is being put into effect supports a conspiracy conviction. *State v. Verive,* 128 Ariz. 570, 581, 627 P.2d 721, 732 (App. 1981). Criminal conspiracy need not be, and usually cannot be, proved by direct evidence. The common scheme or plan may be inferred from circumstantial evidence. *State v. Avila,* 147 Ariz. 330, 336, 710 P.2d 440, 446 (1985); *see also Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy. *State v. Olea,* 139 Ariz. 280, 293, 678 P.2d 465, 478 (App.1983); *United States v. Dunn,* 564 F.2d 348 (9th Cir.1977).

Some conduct must be shown, however slight, because the mere presence of a person at the scene of a crime, even where the person knows that a crime is taking place, will not support a conspiracy conviction. *State v. Green,* 117 Ariz. 92, 94, 570 P.2d 1265, 1267 (App.), *aff'd in part, modified in part,* 116 Ariz. 587, 570 P.2d 755 (1977). This court has stated:

> Mere association does not make a conspiracy. There must be evidence of some participation or interest in the commission of the offense.

*State v. Sullivan,* 68 Ariz. 81, 87, 200 P.2d 346, 350 (1948). *See also United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940).

■ The primary focus of the crime of conspiracy is the agreement itself, the collusion, the secrecy and the resulting threat to society created by such criminal liaisons. *Verive,* 128 Ariz. at 581, 627 P.2d at 732; *see also State v. Dupuy,* 116 Ariz. 151, 153, 568 P.2d 1049, 1051 (1977). Mere knowledge or approval of, or acquiescence in, the object and purpose of a conspiracy without an agreement to cooperate in achieving such object or purpose does not make one a party to conspiracy. *State v. Salazar,* 27 Ariz.App. 620, 625, 557 P.2d 552, 557 (1976). However, a person who knowingly does *any* act to further the object of a conspiracy, or otherwise participates therein, is criminally liable as a conspirator.

15A C.J.S. *Conspiracy* § 73 (1967). In *Verive,* the court stated that "[A]ny action sufficient to corroborate the existence of the agreement and to show that it is being put into effect is sufficient to support the conspiracy." 128 Ariz. at 581, 627 P.2d at 732.

■ Applying the foregoing principles to this case, it is clear that there is evidence of both words and conduct which are highly probative of a conspiracy. Defendant had a motive for revenge against the victim, namely, the earlier shooting incident. He agreed with Gonzales' statement that they were going to get revenge against the victim. He watched, listened, and commented as Gonzales explained how to load the gun. He admitted that he knew what Gonzales was intending to do. He accompanied Gonzales back to the victim's residence, stood beside the house and watched Gonzales fire through the front door. He then agreed with Gonzales that they had gotten the revenge they sought.

The jury obviously rejected defendant's trial testimony and concluded that his admissions to the police and Sanford's testimony more accurately depicted the truth. His denials at trial were thoroughly impeached by his highly accurate admissions to the investigating detectives concerning details only a participant could know. The evidence is sufficient to support the jury's finding.

### DISPOSITION

The single issue raised by defendant presents no error. Pursuant to A.R.S. § 13–4035 and *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), we have reviewed the entire record for fundamental error. We have found none.

Affirmed.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and HOLOHAN, JJ., concur.