245 P.3d 906

**STATE of Arizona, Appellee,**

v.

**Joseph George MARTINEZ, Sr., Appellant.**

**No. 1 CA–CR 09–0150.**

Court of Appeals of Arizona, Division 1, Department D.

Jan. 11, 2011.

Terry Goddard, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Adriana M. Rosenblum, Assistant Attorney General, Criminal Appeals/Capital Litigation Section, Phoenix, Attorneys for Appellee.

Sharmila Roy, Phoenix, Attorney for Appellant.

## OPINION

IRVINE, Judge.

¶ 1 Defendant, Joseph George Martinez, Sr., appeals his conviction and sentence for possession of methamphetamine for sale. He also appeals from the imposition of consecutive sentences for that offense and the separately charged offense of knowingly manufacturing a dangerous drug. We conclude sufficient evidence supports his conviction for possession of methamphetamine for sale. We also find no error in the imposition of consecutive sentences because the two offenses were distinct, could be committed separately, and imposed separate risks. Therefore, we affirm.

1. We view the evidence in the light most favorable to sustaining the verdicts and resolve all inferences against Martinez. *State v. Nihiser,*

## FACTS AND PROCEDURAL HISTORY [1]

¶ 2 On March 21, 2005, Phoenix Police detectives from a task force assigned to investigate clandestine meth labs received a tip that led them to a large store. There, a suspect named Carl bought two boxes of Sudafed, which contains pseudoephedrine, an ingredient used to produce methamphetamine. Police followed Carl to Martinez's house, where he went inside and gave the Sudafed to Martinez's girlfriend, Christine. She gave him a black trash bag, which he placed in a dumpster at the rear of a nearby strip mall.

¶ 3 When the detectives retrieved the trash bag, they immediately noticed a strong solvent odor. Inside, they found "obvious lab trash," including "hundreds" of empty Sudafed blister packs, empty gallon bottles of iodine tincture, empty acetone containers, and stained coffee filters and tubing. Many of the coffee filters and solvent bottles were still "wet," indicating that they had been used recently to manufacture methamphetamine. Carl's delivery of Sudafed pills also suggested to them that more methamphetamine would soon be produced at Martinez's house.

¶ 4 Concerned about a toddler they had seen go inside Martinez's house earlier as they monitored Carl's movements, the detectives returned to the house. They used a ruse that brought Christine outside. Then, wearing breathing masks and "raid shirts" identifying them as police, the detectives knocked and announced their presence and arrested Martinez when he answered. A detective ran into the house and quickly brought the child out.

¶ 5 A "foggy" atmosphere and "overwhelming odor of acetone" prevented the detectives from immediately investigating. They brought in an industrial-sized fan to ventilate the house, a procedure that normally takes about half-an-hour. Even with breathing masks and protective gear, however, the detectives had to wait about two or three hours before they could safely enter.

191 Ariz. 199, 201, 953 P.2d 1252, 1254 (App. 1997).

¶ 6 The contents of the house indicated that this was a very "sophisticated" meth lab that was involved in "very large" and/or "very numerous" cooks. Among numerous other items, the detectives discovered "chemistry grade glassware" not usually found in clandestine labs, electric stirring plates ("Vortex machines") for mixing and stirring components, and multiple home-built "pill presses," each specially designed to rapidly open a different manufacturer's cold pill blister pack. The detectives found "literally hundreds and hundreds" of small, plastic Ziplock baggies, normally used to package illegal drugs for sale; digital scales; "hundreds" of clean coffee filters, normally used to filter the pill binder from the pseudoephedrine; and a large quantity of empty cold pill blister packs. They also seized containers of solvents and chemicals commonly used in "meth cooks," such as Naphta, acetone, paint thinner and muriatic acid.

¶ 7 These items were found in the master bedroom and master bathroom, which were the main areas in which Martinez produced and sold methamphetamines. In the master bedroom closet, detectives also found pills in the active extraction phase. In addition, detectives seized a coffee filter with .11 grams of methamphetamine and two baggies on a dresser in the master bedroom containing .14 grams and .53 grams of methamphetamine.

¶ 8 The State charged Martinez with conspiracy to manufacture dangerous drugs for sale, a Class 2 felony (Count 1); illegal conduct of an enterprise, a Class 3 felony (Count 2); manufacture of a dangerous drug, a Class 2 felony (Count 3); two counts of child abuse for Martinez's children, Class 2 felonies (Counts 4 and 5); possession of a dangerous drug for sale, a Class 2 felony (Count 7); possession of marijuana, a Class 6 felony (Count 8); and possession of drug paraphernalia, a Class 6 felony (Count 9).[2] A jury acquitted Martinez of both child abuse counts, but found him guilty as charged of all remaining counts. The same jury also found three aggravators.

¶ 9 On February 25, 2009, the trial court sentenced Martinez to presumptive terms with one historical prior on all six offenses. It ordered concurrent sentences for conspiracy, illegal enterprise, manufacture of dangerous drugs for sale, possession of marijuana, and possession of drug paraphernalia. Consecutive to these, however, the trial court imposed a presumptive term for possession of dangerous drugs for sale.

¶ 10 Martinez timely appealed. We have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes ("A.R.S.") sections 12–120.21(A)(1)(2003), 13–4031 and –4033 (2010).[3]

### DISCUSSION

### 1. Sufficiency of the Evidence

 ¶ 11 Martinez contends the State presented insufficient evidence that he possessed for sale the methamphetamine found in the two baggies in his bedroom. He argues that the evidence presented at trial was consistent with personal use only and not sales, focusing primarily on the small quantity of methamphetamine and cash seized.

 ¶ 12 A conviction must be supported by substantial evidence of guilt. *State v. Mathers,* 165 Ariz. 64, 66–67, 796 P.2d 866, 868–69 (1990). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *Id.* at 67, 796 P.2d at 869 (quoting *State v. Jones,* 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980)). In determining whether substantial evidence exists, we view the facts in the light most favorable to sustaining the jury verdict and resolve all inferences against Martinez. *State v. Stroud,* 209 Ariz. 410, 412, 103 P.3d 912, 914 (2005) (citing *State v. Arredondo,* 155 Ariz. 314, 316, 746 P.2d 484, 486 (1987)). To set aside a jury verdict based on insufficient evidence, it must clearly appear that, on any hypothesis, there is no sufficient evi-

---

**2.** Count 6, transferring or furnishing possession of precursor chemicals, was charged against Carl only.

**3.** We cite to the current version of the applicable statutes when no revisions material to this case have occurred.

dence to support the conclusion reached by the jury. *Arredondo,* 155 Ariz. at 316, 746 P.2d at 486.

¶ 13 Substantial evidence supports the jury's verdict. Most importantly, Carl testified that he had bought methamphetamine from Martinez at his home "[t]wo or three times a week" in the three-month period prior to the raid and that he would either pay Martinez outright for the meth or trade cold pills for meth. He stated that he bought the methamphetamine from Martinez in the master bedroom because "that's where he usually was," and that Martinez would keep the methamphetamine he sold "in different places" in the bedroom. Carl also stated that the methamphetamines were produced in the master bedroom and master bathroom.

¶ 14 Furthermore, Carl testified that the amount of methamphetamine he purchased from Martinez "depended on how much meth he had." Martinez would sometimes give him "just a little bit to get [him] through the day," and other times, he would give him more. Carl also said Martinez would sometimes measure the amount with a scale or simply "put a little bit in a baggie for [him]."

¶ 15 This evidence was sufficient to permit a reasonable jury to conclude that the methamphetamine contained in the baggies found in the bedroom, whatever its weight, was intended for sale. It is not insubstantial simply because reasonable persons might have drawn a different conclusion from the evidence. *State v. Toney,* 113 Ariz. 404, 408, 555 P.2d 650, 654 (1976) (citing *State v. Ballinger,* 110 Ariz. 422, 425, 520 P.2d 294, 297 (1974)). Because substantial evidence supports the jury's conclusion, we affirm the conviction for possession of methamphetamine for sale.[4]

### 2. Consecutive Sentences

■ ¶ 16 Martinez next contends the trial court violated A.R.S. § 13–116 (2010), which prohibits consecutive sentences for offenses arising out of a single act or omission. The trial court imposed consecutive sentences af-

ter finding the offenses of possessing for sale and manufacturing to be distinct:

> And I want to differentiate the two different kinds of crimes here, because I think there are two different kinds of crime[s] here. Illegally controlling an enterprise and conspiracy and drug manufacture are very much legal descriptions for the same kind of behavior. But selling drugs and making drugs are two different things, with two very different [societal harms].[5]

> There are people out there who make drugs available by opening their front door and selling drugs out the front door selling poison, helping people ruin their lives. That's a societal harm that the statutes and sentencing laws are directed at. Manufacturing drugs not only increases drug supply, but creates its own societal harm.

> . . . .

> Because I find two distinct harms in drug manufacture and drug sales, . . . I have made the determination that many of the counts will run largely concurrent, but I made the determination that the sentencing in Count Seven possession of dangerous drugs for sale, will run consecutive to the other counts.

Martinez argues the trial court should not have imposed a consecutive sentence for possession of dangerous drugs for sale, because manufacture of dangerous drugs for sale cannot be completed without possession, and the evidence necessary to prove each offense was the same. We disagree.

¶ 17 Because Martinez failed to raise this issue before the trial court, we review only for fundamental error. *State v. Henderson,* 210 Ariz. 561, 567,¶ 19, 115 P.3d 601, 607 (2005). Martinez correctly states that the imposition of an illegal sentence constitutes fundamental error. *State v. Thues,* 203 Ariz. 339, 340, ¶ 4, 54 P.3d 368, 369 (App.2002) (citing *State v. Cox,* 201 Ariz. 464, 468, ¶ 13, 37 P.3d 437, 441 (App.2002)). We conclude, however, no such error exists in this case.

---

4. Because we affirm the guilty verdict on the possession for sale charge, we need not address Martinez's arguments concerning simple possession.

5. The transcript erroneously reports this term as "society alarms."

¶ 18 If Martinez's conduct in manufacturing the methamphetamine for sale and in possessing it for sale constitutes "a single act," consecutive sentences are barred under A.R.S. § 13–116. The statute itself provides little guidance in defining when separately charged offenses must be considered "a single act," but in *State v. Gordon*, 161 Ariz. 308, 315, 778 P.2d 1204, 1211 (1989), our supreme court detailed an analytical "construct with which to interpret the statute." It stated that courts should

> judge a defendant's eligibility for consecutive sentences by considering the facts of each crime separately, subtracting from the factual transaction the evidence necessary to convict on the ultimate charge—the one that is at the essence of the factual nexus and that will often be the most serious of the charges. If the remaining evidence satisfies the elements of the other crime, then consecutive sentences may be permissible under A.R.S. § 13–116. In applying this analytical framework, however, we will then consider whether, given the entire "transaction," it was factually impossible to commit the ultimate crime without also committing the secondary crime. If so, then the likelihood will increase that the defendant committed a single act under A.R.S. § 13–116. We will then consider whether the defendant's conduct in committing the lesser crime caused the victim to suffer an additional risk of harm beyond that inherent in the ultimate crime. If so, then ordinarily the court should find that the defendant committed multiple acts and should receive consecutive sentences.

*Id. See also State v. Runningeagle*, 176 Ariz. 59, 67, 859 P.2d 169, 177 (1993) (describing *Gordon* as applying a three-part test).

¶ 19 In this case, the ultimate charge is either (1) knowingly possessing a dangerous drug for sale, or (2) knowingly manufacturing a dangerous drug. Each offense is defined in A.R.S. § 13–3407, subsections (A)(2) and (A)(4), respectively. Each is a Class 2 felony. A.R.S. § 13–3407(B)(2) and (4) (2010). Taking into account Martinez's historical prior offense, the trial court imposed the presumptive sentence of 9.25 years for each offense, noting that its decision not to impose an aggravated sentence on the individual charges was based on a determination that the presumptive sentences would be served consecutively.

¶ 20 For analytical purposes we will assume that Martinez's "ultimate crime" was to knowingly possess a dangerous drug for sale, although the result would be the same if we treated manufacturing as the ultimate crime. As noted above, the evidence sufficiently supports the charge that Martinez knowingly possessed the methamphetamine for sale. Carl admitted that, several times a week, he paid Martinez either cash or Sudafed pills for methamphetamine, which Martinez placed in ziplock baggies. Carl said that the amount he bought depended on the quantity Martinez possessed. In addition, Carl testified that Martinez kept the methamphetamine in the master bedroom. When police searched Martinez's master bedroom, they found two ziplock baggies containing methamphetamine on a dresser, corroborating Carl's testimony.

¶ 21 Subtracting this evidence from the factual transaction, the question becomes whether the remaining evidence shows that Martinez knowingly manufactured methamphetamine. The evidence showed that Martinez did not simply possess methamphetamine for sale, but produced it in his house. This was evidenced by: the materials found in the trash bag, including bottles of iodine tincture, tubing and solvent-stained coffee filters that were still "wet"; the foggy atmosphere and strong acetone odor of the house; the sophisticated laboratory equipment, including specially designed "pill presses" and electronic (Vortex) stirrers; numerous gallon containers of solvents and chemicals often used in "meth cooks"; "literally hundreds" of empty blister packs of pseudoephedrine pills; materials in various stages of methamphetamine production, including pills in the extraction phase and methamphetamine in a coffee filter on the dresser in the master bedroom.

¶ 22 Martinez argues that all the evidence of manufacturing is insufficient because "the crystallized meth found in the house would be necessary to show that meth was being manufactured." We disagree. Comparing the elements of the offenses, it is possible to

commit possession for sale without also manufacturing dangerous drugs, as manufacturing contains no possession element. *See* A.R.S. §§ 13–3401(17), –3407(A)(4). We recognize that proving manufacturing requires more than simply showing that a defendant possessed the equipment or chemicals for the purpose of manufacturing dangerous drugs. Indeed, the statute separately defines the offense of possessing such equipment or chemicals for the purpose of manufacturing, and makes it a Class 2 felony if the offense involves methamphetamine. A.R.S. § 13–3407(A)(3) and (B)(3). Here, however, the evidence showed more than the possession of the equipment and chemicals. It showed their use in every stage of methamphetamine manufacturing. This evidence would have been sufficient to support Martinez's conviction for manufacturing a dangerous drug even if no methamphetamine had been found in his house.

¶ 23 Martinez incorrectly relies on *State v. Price*, 218 Ariz. 311, 183 P.3d 1279 (App. 2008). In *Price*, defendant was convicted of armed robbery, aggravated robbery, and aggravated assault. *Id.* at 312, ¶ 1, 183 P.3d at 1280. There, consecutive sentences were not permitted because, after subtracting evidence from the more serious offenses of armed robbery and aggravated robbery, no deadly weapon or act remained that would have placed the victim in "reasonable apprehension of imminent physical injury." *Id.* at 315–16, ¶¶ 16, 20, 183 P.3d at 1283–84. In contrast, the evidence that supports each element of the offenses in this case is distinct and separate.

¶ 24 Therefore, the first step in the *Gordon* test allows consecutive sentences. Moving to the second prong of the test, we conclude that it was not factually impossible for Martinez to commit both crimes. He could have possessed the drugs for sale without manufacturing them, and he could have been found guilty of manufacturing dangerous drugs even if none were actually found in his possession.

¶ 25 Finally, the third prong of *Gordon* is also met because Martinez's manufacture of

methamphetamine caused an additional risk of harm not inherent in possession of methamphetamine for sale alone. *See Gordon,* 161 Ariz. at 315, 778 P.2d at 1211. Manufacturing poses dangers to neighbors and the environment, as well as to drug users themselves. These dangers go beyond those posed from simply selling the drugs. Therefore, a consecutive sentence was not prohibited by A.R.S. § 13–116.

## CONCLUSION

¶ 26 For the reasons stated above, we affirm Martinez's convictions and sentences.

CONCURRING: LAWRENCE F. WINTHROP, Presiding Judge, and RANDALL H. WARNER, Judge.[6]