NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

ALBERT KARL HEITZMANN, *Appellant.*

No. 1 CA-CR 18-0136

FILED 6-11-2019

Appeal from the Superior Court in Maricopa County
No. CR2017-002847-001 DT
The Honorable Dean M. Fink, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Carlos Daniel Carrion
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Diane M. Johnsen and Judge Jennifer M. Perkins joined.

**W I N T H R O P**, Judge:

¶1        Albert Karl Heitzmann appeals his convictions and sentences for two counts of stalking, arguing insufficient evidence supports each count.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Heitzmann.  *See State v. Kiper*, 181 Ariz. 62, 64 (App. 1994).

¶3        In August 2017, Heitzmann was indicted for one count of misconduct involving weapons, a class four felony (Count I) and two counts of stalking, each a class three felony (Counts II and III).  The State later alleged (1) Heitzmann was a repetitive offender and (2) aggravating circumstances existed.  For trial purposes, Count I, the misconduct involving weapons charge, was severed from Counts II and III, the stalking charges, and later dismissed without prejudice at sentencing on Counts II and III.

¶4        At trial, the State presented the following evidence:  From November 2006 to April 2007, J.G., a prosecutor with the Maricopa County Attorney's Office ("MCAO"), represented the State in prosecuting a man named Paul Speer for homicide.  Speer had burglarized an apartment and, while in jail pending trial on the burglary charge, convinced his half-brother, Brian Womble, to shoot the burglary victims to prevent them from testifying.  *See State v. Speer*, 221 Ariz. 449, 452-54, ¶¶ 2-19 (2009).  At Speer's homicide trial, Heitzmann was called as a witness and examined by J.G.

¶5        Just before the Speer trial began, however, MCAO learned Speer had developed an escape plan involving Heitzmann and Womble that included assassinating J.G.  The threat was investigated, but the records from the investigation were later purged.  After the Speer trial, J.G. prosecuted Heitzmann.

¶6        In 2012, defense attorney Nathanial Carr, III, represented Speer in his appeal.  After telling Carr that he wanted to help Speer "in any possible way," Heitzmann personally dropped off a letter at Carr's office that included the phrase, "My plan to assassinate [J.G.]."  Heitzmann had attached to the letter minute entries from Speer's trial that referenced Speer's previous assassination plan.  Concerned about another possible assassination plan, Carr contacted the Arizona State Bar, and after speaking with a Bar representative, Carr called J.G. and faxed to her the letter he had

received from Heitzmann. The letter "unnerved" J.G. Carr had previously worked with J.G., and this was the first time he had ever seen her show any signs of nervousness about being a prosecutor.

¶7 J.G. testified she considered the letter a second threat on her life and was "terrified" by it. She had surveillance cameras installed at her home, and police began conducting extra patrols in her neighborhood. She also altered her driving route to work each day, purchased ammunition for a gun she had acquired after the initial threat on her life, and loaded the gun to "keep it ready."

¶8 In June 2012, MCAO Detective Crowe interviewed Heitzmann, who admitted authoring the letter and attaching the minute entries. Heitzmann said the assassination plan was Speer's, and that it involved Heitzmann and Womble bursting into the courtroom during Speer's trial and shooting J.G., the judge, and possibly others, and then using bolt cutters to help Speer escape. Heitzmann admitted he and Womble had planned to obtain firearms and bolt cutters to carry out the plan. According to Detective Crowe, Heitzmann seemed "kind of excited" in describing the plan, and although Heitzmann later claimed it was "a joke," the detective believed Heitzmann seemed sincere when he called the plan "brilliant." Heitzmann appeared upset with J.G., stating she had committed a "fraud" or perjury against him, and although he denied to Detective Crowe that he wanted to harm her, he also told Detective Crowe that "shooting her would be too good for her" and that she had plenty to worry about because when he got all of his items together, he would "come after her [] big time." The next day, Detective Crowe searched Heitzmann's residence and found an operational firearm and ammunition where Heitzmann said it would be—in a shed behind his mother's house.

¶9 A day or two after Carr faxed the letter to J.G., J.G. saw Heitzmann in the lobby of the building where MCAO is located. J.G. immediately turned around, went back up the elevator, and notified security. She testified she thought Heitzmann was going to shoot her. She later learned from Detective Crowe that Heitzmann possessed a firearm and a plan involving shooting her.

¶10 After the 2012 threat, J.G. twice testified against Heitzmann. In her testimony, she expressed her fear that he would follow through on his assassination plot. Heitzmann was present during her testimony, and he also testified and admitted writing the letter that contained the phrase, "My plan to assassinate [J.G.]."

¶11        A court order was put in place that prevented Heitzmann from having any contact with J.G. and required him to seek permission before entering any building in the downtown court complex, which included J.G.'s listed work address at MCAO—301 W. Jefferson.  On January 16, 2014, Heitzmann signed to signify his receipt and acknowledgement of that three-year order.  At no time after the order was put into place did Heitzmann seek or receive permission to enter MCAO or the downtown court complex.

¶12        Beginning in August 2015, after he had been ordered not to have contact with J.G., Heitzmann submitted four notices of claim to J.G.'s office.  Notices of claim need not be personally served.  *See generally* Ariz. Rev. Stat. ("A.R.S.") § 12-821.01(A) (requiring that claims be filed "as set forth in the Arizona rules of civil procedure").  He mailed the first notice of claim—dated August 14, 2015—to MCAO, which received it on August 15, 2015.  He then personally served three more notices of claim on MCAO at 301 W. Jefferson on January 4, February 16, and February 24, 2016.  Appearing at the MCAO office, he requested to personally serve J.G., but MCAO Detective Ippolito refused the request, explaining it was "out of protocol" or "out of procedure."  All the notices of claim referred to J.G. throughout, referenced the assassination plan, and were quite similar.

¶13        According to J.G., the notices of claim brought back "everything" for her, and she did not feel safe again.  She feared Heitzmann would kill her because he had a gun and had previously written the letter about the assassination plan.  Once again, she began altering her driving routes and took steps to make sure her burglar alarm and gun worked.

¶14        On September 9, 2016, J.G. went to a courtroom in the downtown court complex to appear on behalf of a colleague in a criminal case.  When she walked into the courtroom, Heitzmann, who had both a backpack and a fanny pack, was seated alone on the victims' side of the courtroom. J.G. did not look at Heitzmann, "couldn't believe he was there," and had the "same fear" she had before—that he was "there for one reason and one reason only . . . to kill [her]."

¶15        Another prosecutor who worked with J.G. entered the courtroom and noticed J.G. appeared "extremely upset."  After J.G. alerted the other prosecutor that Heitzmann was present, she immediately called MCAO's head of investigations.

¶16        Several MCAO law enforcement officers wearing guns and badges soon arrived and took seats surrounding Heitzmann.  At some

point, J.G. spoke with the defense attorney. As J.G. moved beside the defense attorney, Heitzmann approached and handed the defense attorney a note. At that, J.G. nearly "jump[ed] out of [her] skin" because Heitzmann "was within touching distance" of her and she feared for her life. The other prosecutor described J.G. as "extremely shaken" by this incident.

¶17        When the case was called, J.G. announced her full name to the court. By this point, Heitzmann had moved to the defendants' side of the courtroom, and he remained in the courtroom until J.G. exited. J.G. had been in the courtroom with Heitzmann present for approximately thirty minutes, and she left the courtroom escorted by one of the MCAO detectives.

¶18        Two MCAO detectives followed Heitzmann out of the courthouse, then spoke with him. Heitzmann stated he had been in the courtroom because a friend had a matter before the court. He acknowledged seeing J.G., but denied initially recognizing her and claimed he left right after he did so, despite that he stayed in the courtroom after J.G. announced her name to the court and left only after J.G. left.

¶19        A few days after this incident, courthouse security notified J.G. that Heitzmann had been stopped from entering the central court building. Surveillance footage showed Heitzmann at the court building on both September 9 and 13, 2016. On September 13, 2016, MCAO Detective Baniszewski received notice Heitzmann had entered the courthouse, but court security was unable to locate him. Detective Baniszewski personally notified J.G., who "was shaking" and "in a frenzy." According to Detective Baniszewski, J.G. packed up her belongings, began yelling that Heitzmann "was going to kill her," and ran out of her office and drove away. J.G. was so fearful of going to the courthouse that she began limiting her court appearances. At the time of trial, J.G. stated that she continued to be in fear for her life because of Heitzmann.

¶20        On August 13, 2017, law enforcement officers recorded a phone call between Heitzmann and his sister, during which he asked her to find out if J.G. was married. Detective Baniszewski testified that, as an investigator, she found the request "troubling" because it showed Heitzmann was trying to obtain personal identifying information about J.G.

¶21        After the State rested its case-in-chief, Heitzmann moved for a judgment of acquittal on both counts, *see* Ariz. R. Crim. P. ("Rule") 20(a)(1), arguing there was "no testimony that [he] had any intent whatsoever to put [J.G.] in fear of death." After a brief argument, the trial

court denied the motion, concluding the State had presented sufficient circumstantial evidence from which the jury could find intent.

¶22　　　　The jury found Heitzmann guilty of Count II as charged, unanimously agreeing on the following acts supporting the conviction: (1) "Sending [the] notice of claim dated 8-14-15"; (2) "Service of notice of claim at 301 W. Jefferson on 1-4-16"; and (3) "Service of notice of claim at 301 W. Jefferson on 2-16-16."  As to Count III, the jury found Heitzmann guilty of the lesser-included offense of stalking based on "causing [the] victim to fear physical injury," a class five felony, unanimously agreeing on the following acts to support the conviction: (1) "9-9-16 Presence at 201 W. Jefferson Courthouse"; and (2) "9-13-16 Presence at 201 W. Jefferson Courthouse." The jury also found proven as aggravating factors for both offenses that (1) Heitzmann had recently served a prison sentence from 2013 to 2015, and (2) "[t]here is a need for deterrence with this defendant who has a substantial criminal history."

¶23　　　　After determining Heitzmann had two historical prior felony convictions, the trial court sentenced him as a Category Three repetitive offender.  The court imposed a partially aggravated, less-than-maximum sentence of fifteen years' imprisonment for Count II, and a concurrent maximum sentence of six years' imprisonment for Count III, while crediting him for 341 days of pre-sentence incarceration.

¶24　　　　We have jurisdiction over Heitzmann's timely appeal pursuant to the Arizona Constitution, Article 6, Section 9, and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## ANALYSIS

### I.　Standard of Review and Applicable Law

¶25　　　　We review *de novo* the sufficiency of the evidence supporting a conviction and the trial court's ruling on a motion for judgment of acquittal.  *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011).  A motion for judgment of acquittal should be granted only "if there is no substantial evidence to support a conviction."  Ariz. R. Crim. P. 20(a)(1).  "Substantial evidence is that which reasonable persons could accept as sufficient to support a guilty verdict beyond a reasonable doubt."  *State v. Davolt*, 207 Ariz. 191, 212, ¶ 87 (2004) (citing Rule 20).

¶26　　　　In a Rule 20 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *West*, 226 Ariz. at 562, ¶ 16 (citations omitted). "To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Bustamante*, 229 Ariz. 256, 258, ¶ 5 (App. 2012) (quoting *State v. Arredondo*, 155 Ariz. 314, 316 (1987)). "If reasonable persons may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial." *Davolt*, 207 Ariz. at 212, ¶ 87 (citation omitted).

¶27 In reviewing whether sufficient evidence exists, we consider both direct and circumstantial evidence, *West*, 226 Ariz. at 562, ¶ 16, recognizing that a conviction may rest solely on circumstantial evidence, *State v. Nash*, 143 Ariz. 392, 404 (1985); *accord State v. Bible*, 175 Ariz. 549, 560 n.1 (1993). The State is not required "to negate every conceivable hypothesis of innocence when guilt has been established by circumstantial evidence." *Nash*, 143 Ariz. at 404 (citation omitted). Further, we resolve all conflicts in the evidence against Heitzmann. *See Bustamante*, 229 Ariz. at 258, ¶ 5.

## II. *Substantial Evidence Supporting the Convictions*

¶28 The stalking statute, A.R.S. § 13-2923, was amended on August 6, 2016. *See* 2016 Ariz. Sess. Laws, ch. 44, § 1 (2d Reg. Sess.). Count II was based on conduct occurring before August 6, 2016, and Count III was based on conduct occurring after this date.

### A. *Count II*

¶29 To prove Count II, stalking involving the notices of claim, the State had to prove Heitzmann "intentionally or knowingly engage[d] in a course of conduct that [wa]s directed toward another person and [] that conduct . . . [w]ould cause a reasonable person to fear death of that person . . . and that person in fact fear[ed] death of that person." A.R.S. § 13-2923(A)(2) (West 2015). For Counts II and III, "[i]ntentionally" "means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). "'Knowingly' means, with respect to conduct or a circumstance described by a statute defining an offense, that a person is aware or believes that the person's conduct is of that nature or that the circumstance exists. It does not require any knowledge of the unlawfulness of the act or omission." A.R.S. § 13-105(10)(b). For Count II, "[c]ourse of conduct" was statutorily defined in relevant part as "[m]aintaining visual or physical proximity to a specific person or directing

verbal, written or other threats, whether express or implied, to a specific person on two or more occasions over a period of time, however short." A.R.S. § 13-2923(C)(1)(a)(i) (West 2015).

¶30     As to Count II, Heitzmann notes the State was required to prove he directed an express or implied threat at J.G., and argues he did not directly threaten her with death but merely referenced the previous assassination plot originated by Speer to provide context to his notices of claim.

¶31     The jury found that Heitzmann mailing the notice of claim on August 14, 2015, and personally serving the notices of claim on January 4 and February 16, 2016, were the occasions for the course of conduct that constituted stalking as alleged in Count II.  Given the full history between Heitzmann and J.G., as recounted above, the jury could reasonably agree from the evidence that these notices of claim were express or implied threats to J.G. that would cause a reasonable person—and in fact caused J.G.—to fear death.  *See* A.R.S. § 13-2923(A)(2), (C)(1)(a)(i) (West 2015).

¶32     The notices of claim did more than inform MCAO of a civil claim—they repeatedly referenced J.G. and the previous assassination plot. Heitzmann knew there was a court order in place that prohibited him from contacting J.G. or entering her place of employment—MCAO at 301 W. Jefferson—without permission.  Nevertheless, he entered the MCAO office without permission to personally serve the January 4 and February 16 claim notices and, while there, asked to serve J.G. in person.  He did so after he had heard J.G. testify in another case that she feared he would follow through on the assassination plan.  Detective Ippolito testified it was rare for someone to serve the same notice more than once; in fact, it was the first time he could recall that ever happening, and Heitzmann delivered essentially identical notices of claim four times.  The jury could reasonably find there was no reason for him to personally serve the notices of claim except to try to intimidate J.G. and cause her to fear death.

¶33     Moreover, J.G. testified she feared Heitzmann would kill her and he could follow through on the plot because he owned a firearm.  The jury could find this fear was reasonable considering, *inter alia*, the assassination plan originated with Speer, who had already been prosecuted for first-degree murder; Heitzmann knew about the assassination plan and admitted he and Womble had planned to obtain firearms and bolt cutters to follow through with it; and Heitzmann owned a firearm and ammunition.

¶34 Further, although Heitzmann claimed he had no intent to harm J.G., the jury was not compelled to accept his contention or believe his statements to MCAO detectives. *See State v. Pieck*, 111 Ariz. 318, 320 (1974). As the trial court recognized, it was for the jury to weigh the evidence, determine witnesses' credibility, and ascertain Heitzmann's intent, *see id.*; *State v. Williams*, 209 Ariz. 228, 231, ¶ 6 (App. 2004), and there was substantial evidence from which the jury could conclude Heitzmann intentionally or knowingly directed threats to J.G. that would cause a reasonable person—and did cause her—to fear death.

*B. Count III*

¶35 To prove the lesser-included stalking offense found by the jury as Count III, the State had to prove Heitzmann "intentionally or knowingly engage[d] in a course of conduct that [wa]s directed toward another person and [] that conduct cause[d] the victim to [s]uffer emotional distress or reasonably fear" physical injury. A.R.S. § 13-2923(A)(1)(b)(i) (West 2016). For this offense, "[c]ourse of conduct" "[m]eans directly or indirectly, in person or through one or more third persons or by any other means, to . . . [m]aintain visual or physical proximity to a specific person or direct verbal, written or other threats, whether express or implied, to a specific person on two or more occasions over a period of time, however short." A.R.S. § 13-2923(D)(1)(a)(i) (West 2016).

¶36 As to Count III, Heitzmann argues that on September 9, 2016, he had no way of knowing J.G. would appear in the courtroom he entered to support a friend appearing for a court matter. He argues J.G.'s name was not on the court calendar, he did not recognize her when he approached the defense attorney, he had no way of leaving the courtroom without going near her, and he did not follow or directly contact her. He further argues that on September 13, 2016, although he violated a court order, he did not encounter or come within visual or physical proximity of J.G. Accordingly, he maintains the evidence was insufficient to show he intentionally or knowingly engaged in a course of conduct directed toward J.G. that would cause a reasonable person to fear for her safety. Heitzmann made this same general argument before the jury, which was in the best position to weigh the evidence and assess his credibility. *See Williams*, 209 Ariz. at 231, ¶ 6.

¶37 The jury found Heitzmann guilty on Count III based on his presence at the courthouse on September 9 and 13, 2016. On September 9, 2016, even though J.G. was not listed on the court calendar that day, she announced her name when the case was called. According to several prosecution witnesses, J.G. has a unique voice and distinct appearance.

Heitzmann remained in the courtroom near her for approximately thirty minutes and only left after she left. Heitzmann knew there was a court order in place forbidding him from contacting J.G. and requiring him to seek permission to enter the courthouse, which he did not do. The jury could reasonably infer from the evidence that Heitzmann waited to pass the note to the defense attorney until that attorney was near J.G. in order to scare J.G. and cause her to suffer emotional distress or reasonably fear physical injury, especially since he did this after he had heard J.G. express her fear of him following through on the assassination plan.

¶38 Further, it was reasonable for J.G. to fear Heitzmann could physically injure her because the prior assassination plan involved shooting her in a courtroom; she knew Heitzmann owned a firearm; Heitzmann was carrying both a fanny pack and backpack that day; and persons can bypass security by following a badged employee into the building located at 301 W. Jefferson, which has a bridge to the courthouse.

¶39 Thus, the jury could conclude Heitzmann intentionally or knowingly maintained visual or physical proximity to J.G. during the thirty minutes in the courtroom and this reasonably caused J.G. to suffer emotional distress or fear physical injury. *See* A.R.S. § 13-2923(A)(1)(b)(i), (D)(1)(a)(i) (West 2016). Further, the jury also could have concluded Heitzmann directed an implicit threat at J.G. by approaching her in the courtroom, and that his doing so caused J.G. to suffer emotional distress or fear physical injury. *See id.*

¶40 On September 13, 2016, Heitzmann again entered the central court building in violation of the court order, after MCAO detectives had followed him out on September 9, 2016. As Detective Baniszewski explained at trial, Heitzmann's behavior had escalated—from mailing a notice of claim, to personally delivering several notices of claim, to being in the courthouse and seeing J.G. in person, to approaching within a few feet of her in the courtroom, to going back to the courthouse only days after seeing her in court. Heitzmann also continued to try to seek personal information about J.G. The jury could reasonably infer from this evidence that Heitzmann intentionally or knowingly went to the courthouse as an implicit threat to J.G., *see* A.R.S. § 13-2923(A)(1)(b)(i), (D)(1)(a)(i) (West 2016), and/or that he was in physical proximity of J.G. when he was in the courthouse where she worked, where he had seen her just four days earlier at the same location, and where the court order prohibited him from entering without permission, *see id.* And it was reasonable for J.G. to fear physical injury based on the prior assassination plan that involved

Heitzmann entering a courtroom and shooting J.G., Heitzmann's ownership of a firearm and ammunition, and the escalation of his behavior.

**¶41**　　　　Although Heitzmann provided alternative explanations and claimed he had been at the courthouse for other reasons, it was for the jury to weigh the evidence. *See State v. Clemons*, 110 Ariz. 555, 556-57 (1974). Even if he had come to the courtroom for other reasons on September 9, 2016, he remained in the courtroom for approximately thirty minutes after J.G. entered, and the jury could reasonably infer he took advantage of the opportunity to threaten J.G. by remaining in the courtroom and walking close to her. And the jury could conclude he returned on September 13, 2016, intending to implicitly threaten J.G. again. His explanations did not negate the State's evidence or require a directed verdict but instead made his intent an issue for the jury to resolve. *See State v. Manzanedo*, 210 Ariz. 292, 293, ¶ 3 (App. 2005). Accordingly, substantial evidence supports Count III as well.

## CONCLUSION

**¶42**　　　　Heitzmann's convictions and sentences are affirmed.

