NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

STEVEN MICHAEL HUMELHANS, *Appellant.*

No. 1 CA-CR 13-0555

FILED 9-23-14

Appeal from the Superior Court in Maricopa County
No. CR2012-006707-001
The Honorable Bruce R. Cohen, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

The Hopkins Law Office PC, Tucson
By Cedric Martin Hopkins
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Kenton D. Jones delivered the decision of the Court, in which Judge Margaret H. Downie and Judge Donn Kessler joined.

---

J O N E S, Judge:

¶1        Defendant Steven Michael Humelhans appeals his conviction and sentence for first degree murder.  Humelhans' defense counsel has searched the record on appeal and asserts he has found no arguable question of law that is not frivolous.  Therefore, in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), defense counsel asks this Court to search the record for fundamental error.  Humelhans was afforded the opportunity to file a supplemental brief *in propria persona*, which he elected to do.  After reviewing the record, we find no error.  Accordingly, Humelhans' conviction and sentence are affirmed.

### FACTS[1] AND PROCEDURAL HISTORY

¶2        In the early morning of March 11, 1988, Eric R., the night manager of a Domino's Pizza Store, was seen leaving the store to make the night deposit.  The deposit was never made, and the store did not open as scheduled the next day.  Another employee discovered the front doors were both locked, but the back door was unlocked and ajar.  Eric R. left several personal belongings in the office, including his jacket, some cigarettes and his paycheck.  The floor safe was open and empty, the closing paperwork was incomplete, and approximately $2,250 was missing from the store.

¶3        About this same time, Eric R. was found in the desert north of Phoenix.  He had been shot at least ten times in the back of the head, neck, back, right leg, shoulder and right arm, was covered in mud, and barely responsive.  After receiving medical attention, Eric R. regained consciousness and stated he had been tied up and placed in a vehicle, and then shot by "his friends," a "night driver" at Domino's, after they tried to rob him.  Eric R. communicated that there was no cash in the money bag,

---

[1] "We view the evidence and all reasonable inferences therefrom in the light most favorable to sustaining the jury's verdict[]."  *State v. Miles*, 211 Ariz. 475, 476, ¶ 2, 123 P.3d 669, 670 (App. 2005).

but that checks were taken.  Eric R. was then transported to the hospital where he later died from his injuries.

¶4    That same day, a repaving crew discovered a check on the side of the highway, near a pool hall Humelhans frequented.  The check had been written to "Domino's Pizza" on March 10, 1988, the evening before Eric R.'s murder.  The check had not been negotiated, and the repaving crew retained it with the intent to follow up with the intended recipient.  Upon learning of the murder of the Domino's employee, however, they gave the check to the Phoenix Police Department.  Fingerprints recovered from the front and back of the check were ultimately matched to the right middle finger and right thumb of Humelhans.

¶5    By the time of trial, the check had discolored to a dark brown as a result of chemicals used in retrieving the fingerprints.  The information contained on the check, including the date, payee, amount, and signature, remained visible and was confirmed in the Phoenix Police Department's report prepared simultaneously with receipt of the check.

¶6    Over the years that followed the robbery and murder, both the Phoenix Police Department and Domino's own corporate security investigated hundreds of tips, and conducted hundreds of interviews, in an attempt to identify the perpetrator.  One tip led to the interview of Humelhans' then-ex-wife, Heather R., in 1996.

¶7    Heather R. told police Humelhans admitted to her during their marriage that he and his friend, Troy P., had robbed the Domino's store.  Troy P. was a night driver for Domino's.  Heather R. reported the men knew Eric R. and were afraid they would be identified, so they took Eric R. from the store, put him in the trunk of a car and drove him out to the desert.  Humelhans told Heather R. that, over his protest, Troy P. shot Eric R., and the two left the scene believing he was still alive.  This information was relayed voluntarily by Heather R., but was inadmissible against Humelhans pursuant to Arizona's anti-marital fact privilege, which, at that time, afforded the non-accused spouse the ability to decline to testify about marital communications.  Ariz. Rev. Stat. (A.R.S.) § 13-4062(1) (2008).[2]

¶8    After the anti-marital fact privilege was amended in 2009 to eliminate the ability to invoke the privilege if the spouse had previously,

---

[2] Absent material revisions after the relevant dates, statutes cited refer to the current version unless, as here, otherwise indicated.

and voluntarily, disclosed marital communications to law enforcement regarding certain serious offenses, the Phoenix Police Department re-opened its investigation. At the conclusion of its investigation, Humelhans was indicted for first-degree murder under Arizona's "felony murder" rule, stemming from the underlying robbery and abduction of Eric R.

**¶9**      Following a fourteen-day trial, Humelhans was found guilty and sentenced to life imprisonment with the possibility of parole after twenty-five years. Humelhans timely appealed his conviction. We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

**¶10**      In his supplemental brief, Humelhans raises multiple issues, each of which is addressed below. For the reasons set forth, we find no error, and affirm his conviction and sentence.

## I.      Testimony of Humelhans' Former Spouse

**¶11**      Humelhans first argues the trial court erred in permitting his ex-wife, Heather R., to testify about communications that occurred during their marriage. "The existence and scope of a privilege are questions of law . . . that we review de novo." *Advanced Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 222 Ariz. 383, 386, ¶ 6, 214 P.3d 1024, 1027 (App. 2009).

**¶12**      Arizona has codified a marital communications privilege in criminal matters. A.R.S. § 13-4062(1). However, for prosecution of offenses enumerated in A.R.S. § 13-706(F)(1), the privilege is held by the defendant's spouse. *State v. Carver*, 227 Ariz. 438, 442, ¶ 13, 258 P.3d 256, 260 (App. 2011). In 2009, the statute was amended to preclude a spouse from invoking the privilege when "[b]efore testifying, the testifying spouse makes a voluntary statement to a law enforcement officer during an investigation of the offense or offenses about the events that gave rise to the prosecution or about any statements made to the spouse by the other spouse about those events." A.R.S. § 13-4062(1)(a); *Carver*, 227 Ariz. at 440, ¶ 4, 258 P.3d at 258. In light of this amendment, the marital communications privilege did not protect Humelhans' marital communications where he was prosecuted for first-degree murder, a crime included within A.R.S. § 13-706(F), and Heather R. voluntarily told police about the statements Humelhans made to her regarding the robbery and murder.

**¶13**      Humelhans argues, however, that the amendment cannot be applied to compel his ex-wife's testimony about communications made

4

during the marriage and before the amendment's effective date, without his consent. This Court has previously rejected this argument, holding that "the law in effect at the time the evidence is sought by discovery or trial testimony, *not the time the offense was committed or communications made*, governs the admission of testimony subject to the marital communications privilege." *Carver*, 227 Ariz. at 442, ¶ 14, 258 P.3d at 260.[3] Additionally, as stated above, for offenses enumerated in § 13-706(F), the marital communication privilege is held by the spouse, not the defendant. Therefore, because the 2009 amendment became effective before Humelhans' trial, 2009 Ariz. Sess. Laws, ch. 155, § 3 (1st Reg. Sess.), the State could properly compel Heather R. to testify against Humelhans, and Humelhans' consent was not required.[4]

## II.     The March 10, 1988 Personal Check

**¶14**        Humelhans next argues the trial court erred in allowing the State to admit into evidence the personal check to Domino's Pizza that was recovered from the highway the day of Eric R.'s death, given its deteriorated condition.

**¶15**        We review a trial court's ruling on the admission of evidence for an abuse of discretion, *State v. Payne*, 233 Ariz. 484, 503, ¶ 56, 314 P.3d 1239, 1258 (2013), viewing the evidence in the "light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *State v. Harrison*, 195 Ariz. 28, 33, ¶ 21, 985 P.2d 513, 518 (App. 1998) (quoting *State v. Castro*, 163 Ariz. 465, 473, 788 P.2d 1216, 1224 (App. 1989)). Additionally, we may affirm the ruling "on any basis supported by the record." *State v. Robinson*, 153 Ariz. 191, 199, 735 P.2d 801, 809 (1987).

**¶16**        Although the check is largely stained dark brown as a result of the chemicals used to process the paper for fingerprints, it remains identifiable as a personal check containing lines for a date, payee, memo and signature. The stained condition of the check is not determinative of the issue of its admissibility. *See* Ariz. R. Evid. 901(a) ("To satisfy the

---

[3] While Humelhans argues that *Carver* is distinguishable because it concerned testimony between a mother and son, the case is directly on point as it actually involved testimony by one spouse against the other. *Carver*, 227 Ariz. at 439-40, ¶¶ 2-3, 258 P.3d at 257-58.

[4] Alternatively, we held in *Carver* that the 2009 amendment was procedural and, therefore, could be applied retroactively. *Id.* at 442, 445, ¶¶ 15, 29, 258 P.3d at 260, 263.

requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."); *State v. King*, 226 Ariz. 253, 257, ¶ 9, 245 P.3d 938, 942 (App. 2011) (approving flexible approach to authentication in which the unique facts and circumstances of each case must be considered to assess whether evidence exists from which the jury could reasonably conclude the item is what it is purported to be).

**¶17**      Here, the jury could reasonably conclude that the check was authentic. The check can still be read as made out to "Domino's Pizza," dated March 10, 1988, in the amount of $10.81, and signed by the payor. The payor's husband was able to recognize and identify his wife's signature on the check. The Domino's employee who received the check in payment when the pizza was delivered was able to identify it as a personal check he received, and recognized his own initials in the upper right corner. The trial court did not abuse its discretion in admitting the check into evidence where identifying information, establishing the requisite foundation, could still be elicited from various witnesses. Moreover, any information that could not still be gleaned from the check, such as the pre-printed lines and personal information of the payor, was unnecessary for its purposes as evidence at trial.

**¶18**      Additionally, we note that while not dispositive of Humelhans' participation in the crime, the check implicates him in the robbery of the Domino's and Eric R.'s kidnapping. Testimony confirmed the check was written by a patron of the store on the night of the robbery, deposited by the delivery driver at the store upon his return, and later found, unnegotiated, miles outside the store's delivery area and bearing Humelhans' fingerprints. Such evidence is probative of several links in the chain of events leading to Eric R.'s kidnapping and murder. *See State v. Gretzler*, 126 Ariz. 60, 86, 612 P.2d 1023, 1049 (1980) (denying motion to strike where "testimony was probative of several links in the chain of events leading from the kidnapping . . . to the murder . . ."); *see also* Ariz. R. Evid. 402 ("Relevant evidence is admissible . . . ."). Therefore, the admission of the check did not constitute error, let alone fundamental error.

## III.    Fingerprint Evidence

**¶19**      Humelhans next challenges the State's fingerprint experts' reliance on photographs of fingerprints taken from the personal check, arguing the State failed to prove the fingerprints actually came from the check, and that there is no way to verify, based upon the check's current

condition, that there were ever any fingerprints on it.[5]   Humelhans does not clearly articulate the basis for this argument, but we will not overturn a trial court's ruling on the admission or exclusion of evidence "unless a clear abuse of discretion appears and prejudice results therefrom." *Rimondi v. Briggs*, 124 Ariz. 561, 565, 606 P.2d 412, 416 (1980).

**¶20**        We find no error in the admission of fingerprint evidence in this matter.  Our supreme court has previously approved a nearly identical situation in *State v. Gomez*, 226 Ariz. 165, 244 P.3d 1163 (2010).  In *Gomez*, the defendant was arrested and charged with crimes related to a home invasion based upon a match between DNA collected from items at the crime scene and a sample of the defendant's blood.  *Id.* at 166, ¶ 2, 244 P.3d at 1164.  In performing the DNA testing and analysis, the laboratory used a seven-step process to analyze and amplify the DNA and generate profiles.  *Id.* at ¶ 3.  The technicians who performed the first six tasks did not interpret data or draw conclusions.  *Id.*  Only the seventh step involved human analysis.  *Id.* n.1.

**¶21**        At trial, the State called the laboratory's senior forensic analyst/supervisor, to testify about the DNA testing, including the laboratory's operating procedures, standards and safeguards.    *Id.* at ¶ 4.  She also offered her expert opinion that several profiles derived from evidence at the crime scene matched the profile obtained from the defendant's blood sample.  *Id.* at ¶ 5.

**¶22**        Our supreme court found that "[t]he technicians at most could have testified about the mechanical steps they took to process the [evidence].  The analyst was able to review that work, testify from her own knowledge as to the procedures used, and answer questions during cross-examination about the accuracy of the end results."  *Id.* at 169, ¶ 21, 244 P.3d at 1167.  This was sufficient to satisfy the defendant's Sixth Amendment challenge.  *Id.*

**¶23**        The mechanical nature of the initial fingerprint technician's job was recognized in *State v. Best*, where this Court determined a fingerprint examiner's report was admissible under the public records

---

[5] Humelhans also argues that the fingerprint photographs should not have been allowed, while simultaneously acknowledging that they were never admitted into evidence or seen by the jury.  Humelhans' argument that the fingerprint photographs are inadmissible is, therefore, moot.

exception to the hearsay rule. 146 Ariz. 1, 4, 703 P.2d 548, 551 (App. 1985); *see* Ariz. R. Evid. 803(8). In so holding, the Court noted:

> [L]ifting and recording is, for a fingerprint examiner, the type of routine daily task that has always been thought to be reliably done under both the business and official records exceptions to the hearsay rule. The adversarial, confrontational risk of misperception and misrecording present at an arrest of a criminal at the scene of the crime is about as far removed from this routine exercise in a police laboratory as it is possible to imagine.

*Best*, 146 Ariz. at 4, 703 P.2d at 551. The Court added, "[w]hile it is always conceivable that there has been misrepresentation as to where particular prints were lifted, there is nothing in the facts of this case to suggest any motive to falsify, or indeed any risk of falsification" of the fingerprint photographs. *Id.* Similarly, here, Humelhans has not presented any facts to indicate the fingerprints analyzed were falsified.

**¶24** Furthermore, an expert may properly base his testimony upon data provided by others who are not subject to cross-examination, without a requirement that the relied upon data be admitted or admissible. *Gomez*, 226 Ariz. at 169, ¶ 22, 244 P.3d at 1167; *see State v. Smith*, 215 Ariz. 221, 228, ¶ 23, 159 P.3d 531, 538 (2007) (finding no constitutional deficiency when expert, in forming independent conclusions, reasonably relies on information obtained from others not testifying at trial); Ariz. R. Evid. 703 (allowing expert testimony to be based upon facts or data otherwise not admissible, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject").

**¶25** Here, as in *Gomez*, the fingerprint examiners were not acting as a conduit for another person's opinion. Each formed his own opinion, based upon the type of data normally relied upon by experts in their field — latent fingerprints developed and photographed by other technicians — that the analyzed fingerprints matched Humelhans'.[6] Each fingerprint examiner was available for cross-examination about his independent conclusion and the nature of the data upon which he relied. Additionally,

---

[6] The State's fingerprint examiners explained that any chemical processing for fingerprints requires photography in order to preserve the latent prints when they appear. The chemicals will continue to work and the fingerprints will either fade away and disappear, or the material gets darker so that they can no longer be seen.

each of the fingerprint examiners explained his reasoning for believing the analyzed fingerprints were removed from the check. The jury was provided all relevant information regarding the data relied upon, and was free to accept or reject any or all of the explanations and opinions provided by the fingerprint examiners. *See Fry's Food Stores v. Indus. Comm'n*, 161 Ariz. 119, 123, 776 P.2d 797, 801 (1989).

¶26　　　　Consequently, we find no error warranting a new trial related to the reliance of the State's fingerprint examiners on the fingerprint photographs obtained by non-testifying technicians.

¶27　　　　To the extent the nature of Humelhans' argument centers around an alleged inability to independently process the check for evidence, it is without merit. Absent bad faith or prejudice, the State does not act improperly by performing testing on physical evidence that consumes the entire sample, and prevents a defendant from performing his own testing. *State v. Lehr*, 227 Ariz. 140, 150, ¶¶ 41-42, 254 P.3d 379, 389 (2011). Furthermore, there is no violation of the right to confrontation when a person who analyzes evidence is available for full cross-examination about his analysis, even when the evidence itself is no longer available. *State v. Cruz*, 123 Ariz. 497, 500, 600 P.2d 1129, 1132 (App. 1979); *see State v. Youngblood*, 173 Ariz. 502, 508, 844 P.2d 1152, 1158 (1993) ("[A]bsent bad faith on the part of the state, the failure to preserve evidentiary material which could have been subjected to tests, the results of which might have exonerated the defendant, does not constitute a denial of due process of law under the Arizona Constitution.").

¶28　　　　Humelhans has not identified any bad faith motive related to the darkening of the check; nor has he alleged prejudice resulting from the check's deteriorated state. *See State v. Edwards*, 1 Ariz. App. 42, 44, 399 P.2d 176, 178 (1965) (observing appellant always carries burden of demonstrating error). Our independent review of the record reveals that photographs of the check and the fingerprints lifted therefrom were preserved and available to Humelhans following his indictment. We, therefore, find no error in admission of expert testimony regarding the fingerprint analysis.

## IV.　DNA Evidence

¶29　　　　Humelhans next argues that his conviction should be overturned because the DNA evidence recovered from Eric R.'s personal belongings was inconclusive as to identity.

¶30            The evidence demonstrated that Humelhans was neither matched nor excluded from the DNA comparison.  Essentially, over the twenty-five years between Eric R.'s death and trial, the samples had degraded to the point they were no longer useable.  The mere absence of DNA evidence does not, however, create error.  The jury was presented with other evidence that suggested Humelhans was involved in the robbery, abduction, and murder, including a confession to his then-wife, and his fingerprints on the stolen property.  It is solely the duty of the jury to weigh the testimony, determine the witnesses' credibility, and decide the facts in order to determine if the State has proven its case beyond a reasonable doubt.  *State v. Piatt*, 132 Ariz. 145, 150–51, 644 P.2d 881, 886–87 (1981).

¶31            Because there is otherwise sufficient evidence to support the verdict, the absence of DNA evidence linking Humelhans to the crime did not create error.  *See State v. Soto–Fong*, 187 Ariz. 186, 200, 928 P.2d 610, 624 (1996) ("'Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction.'") (quoting *State v. Scott*, 113 Ariz. 423, 424-25, 555 P.2d 1117, 1118-19 (1976)).

## V.    Due Process Concerns Regarding Prior Arrest

¶32            Humelhans next argues his due process rights were violated because he was arrested in connection with this crime in 1996, but was released without charges.

¶33            We interpret Humelhans' argument to amount to a complaint of pre-indictment delay, which, under the right to due process guaranteed by the Fifth and Fourteenth Amendments of the U.S. Constitution, protects a defendant against stale prosecutions.  *State v. Lacy*, 187 Ariz. 340, 346, 929 P.2d 1288, 1294 (1996).  To prevail on this claim, a defendant "must show that the prosecution intentionally slowed proceedings to gain a tactical advantage or to harass the defendant, and that actual prejudice resulted." *See id.*

¶34            Here, Humelhans has not argued, and the record fails to demonstrate, that the State intentionally filed the charges when it did to either gain a tactical advantage or to harass him.  To the contrary, the record is clear that Humelhans was not charged in 1996 because of the inability of the State, at that time, to compel his ex-wife's testimony under the law at that time.  Nor can we say the State intentionally delayed prosecution on the hope of gaining a tactical advantage, even though the change in the law,

thirteen years later, regarding marital privilege benefited the State's case in this instance. *Id.*

**¶35** Moreover, there is no suggestion Humelhans has been prejudiced by any pre-indictment delay. The State was able to procure seventeen witnesses at trial that were involved in the underlying events that occurred twenty-five years prior, all of whom Humelhans had an opportunity to confront and cross-examine in open court. We therefore find no due process violations related to the delay in prosecution.

## VI. Grand Jury Indictment

**¶36** Humelhans next challenges the original grand jury indictment, alleging that the grand jury was provided false information regarding his prior arrests.

**¶37** Arizona Rule of Criminal Procedure 13.5(e) states: "No issue concerning a defect in the charging document shall be raised other than by a motion filed in accordance with Rule 16." Under Arizona Rule of Criminal Procedure 16, motions must be made no later than twenty days prior to the date set for trial. Ariz. R. Crim. P. 16.1(b). "Any motion, defense, objection, or request not timely raised under Rule 16.1(b) shall be precluded, unless the basis therefor was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it." Ariz. R. Crim. P. 16.1(c).

**¶38** Here, Humelhans knew or should have known of the alleged defect from his review of the grand jury transcripts.[7] However, a Rule 16 motion addressing the propriety of information presented to the grand jury was never filed with the trial court.[8] By failing to raise the objection below, Humelhans has waived any error. *State v. Delgado*, 174 Ariz. 252, 255, 848

---

[7] Humelhans' counsel filed a motion for release of the grand jury transcript, which was granted on May 10, 2012. Humelhans had more than three weeks to review the transcript before it was returned to the clerk on June 5, 2012.

[8] Humelhans did file a Motion to Remand with the trial court, but it addressed the separate issue of Humelhans' decision not to speak with law enforcement. This issue was not re-urged on appeal, and we decline to consider it in the absence of fundamental error.

P.2d 337, 340 (App. 1993); *State v. Sowards*, 147 Ariz. 185, 189, 709 P.2d 542, 546 (App. 1984).

## VII.   *Miranda* **Warning**

**¶39**       Humelhans next argues he was not provided a *Miranda*[9] warning following his 2012 arrest.

**¶40**       To admit at trial statements made by persons in custody and in response to police questioning, the police must first have provided the suspect with a recitation of his rights under *Miranda v. Arizona*.  *State v. Zamora*, 220 Ariz. 63, 67-68, ¶ 10, 202 P.3d 528, 532-33 (App. 2009).  If a *Miranda* warning is not given, any statements made by the defendant are excluded from evidence at trial.  *Id.* at 68, ¶ 10, 202 P.3d at 533.

**¶41**       Based upon the record, it does not appear Humelhans ever made any statement to the police, voluntary or otherwise.  Certainly, the State did not introduce into evidence any statements made by Humelhans to law enforcement.  Therefore, the purpose of the *Miranda* warning — to safeguard the Fifth Amendment right against self-incrimination — is not implicated here, *see State v. VanWinkle*, 229 Ariz. 233, 235-36, ¶¶ 10-11, 273 P.3d 1148, 1150-51 (2012), and does not provide any basis for assignment of error.

## VIII.   **Jury Contact**

**¶42**       Humelhans argues for a mistrial based upon a suggestion that the jury may have been improperly influenced during the proceedings because it was not sequestered from the victim's family at all times.

**¶43**       While, in general, juror fraternization with trial participants can have a harmful effect on the judicial process, *see State v. Apodaca*, 166 Ariz. 274, 276-77, 801 P.2d 1177, 1179-80 (App. 1990), the record contains no evidence to substantiate any claims of inappropriate contact, and no objection was made by Humelhans upon these grounds during the trial.  To the contrary, it was discovered that Humelhans' family members were using elevators with jurors, and interspersed with them in the hallway during court recesses.  The issue was identified and remedied without objection from either party.

---

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

**¶44** In the absence of any information or argument to support this allegation, we find no error.

## IX. Testimony of Humelhans' Son

**¶45** Humelhans argues the trial court erred in precluding his son from testifying during the trial.

**¶46** The defense anticipated Humelhans' son would testify to overhearing a conversation between his mother, Heather R., and her current husband, where they discussed how they would spend the reward money allegedly offered for information leading to the conviction of Eric R.'s killer. The purpose of such testimony would have been to impeach Heather R.'s statements denying knowledge of or receiving any reward for information regarding Eric R.'s death.[10]

**¶47** "Extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Ariz. R. Evid. 608(b). Specific instances of conduct may be admitted, in the discretion of the court, "if they are probative of the character for truthfulness or untruthfulness" of the witness or another witness. *Id.* However, this inquiry is permitted only on cross-examination. *Id.* Therefore, Humelhans' son could not, under the applicable rules, be permitted to testify as a direct witness for the defense as to specific actions taken by Heather R. Nor could he comment on her character for truthfulness or untruthfulness during the defense's case-in-chief. *See, e.g.*, *State v. Littles*, 123 Ariz. 427, 430, 600 P.2d 40, 43 (App. 1979) (affirming exclusion of testimony of defense witness establishing victim was "involved in drug rip-offs" because it was not probative of truthfulness or explored on cross-examination). Accordingly, the trial court correctly excluded this testimony.

## X. "More Culpable" Defendant

**¶48** Finally, Humelhans takes issue with the fact that another individual whom he asserts to be "more culpable" of the murder has not been prosecuted for this crime. Even assuming the assertion's truth, it is irrelevant to an analysis and determination of Humelhans' culpability.

**¶49** Pursuant to Arizona's felony murder statute, a person is guilty of first degree murder if "[a]cting either alone or with one or more

---

[10] The Domino's Pizza representative confirmed that no reward money was ever paid in this case, and that the reward was no longer available.

other persons the person commits or attempts to commit [certain enumerated felony offenses] and, in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person." A.R.S. § 13-1105(A)(2). The *mens rea*[11] requirement for felony murder "is supplied by the culpable mental state required for the underlying felony." *State v. Cabanas–Salgado*, 208 Ariz. 195, 197, ¶ 12, 92 P.3d 421, 423 (App. 2003); *see also* A.R.S. § 13–1105(B).

**¶50** Here, the underlying felonies consisted of kidnapping and/or robbery. Accordingly, as to the kidnapping charge, the State was required to prove Humelhans, alone or as an accomplice, "knowingly restrained" Eric R. with the intent to either hold him as a hostage, inflict death or physical injury upon him, or place him in reasonable apprehension of imminent physical injury. A.R.S. § 13-1304(A)(1), (3)-(4). As to the robbery charge, the State was required to prove Humelhans, alone or as an accomplice, while taking property from Eric R. against his will, threatened or used force against Eric R. with the intent to coerce the surrender of property. A.R.S. § 13-1902(A). Based upon the evidence presented, the jury could reasonably conclude that Humelhans possessed the requisite *mens rea* for kidnapping and/or robbery. Indeed, Humelhans admitted to his then-wife that he and Troy P. went to Domino's for the purpose of robbing Eric R., and later drove him out into the desert when they became afraid they would be identified. Humelhans further admitted that Troy P. shot Eric R. and the two left him to die.

**¶51** Humelhans is therefore guilty if he, or any other participant in the underlying felonies, caused Eric R.'s death. That there may have been "one or more other persons" acting "in the course of and in furtherance of the [underlying] offense" that led to Eric R.'s death is no defense to Humelhans' actions. That someone other than Humelhans was the actual shooter is similarly insufficient. *State v. Herrera*, 174 Ariz. 387, 396, 850 P.2d 100, 109 (1993) (finding evidence relating to the identity of the shooter irrelevant when defendant convicted of felony murder and acquitted of premeditated murder). In such a case, each is equally guilty of murder.

## XI.    Prosecutorial Misconduct

**¶52** Defendant suggests the State engaged in misconduct by coercing witnesses to testify and falsely reporting to the trial court judge

---

[11] "*Mens rea*" is defined as "the state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime." Black's Law Dictionary 1006 (8th ed. 1999).

that his son had an outstanding warrant for his arrest. Prosecutorial misconduct will warrant a mistrial if the misconduct "permeates the entire trial and deprives the defendant of a fair trial." *State v. Trani*, 200 Ariz. 383, 384, ¶ 6, 26 P.3d 1154, 1155 (App. 2001). We discern no such misconduct here.

**¶53** First, there is no evidence or suggestion in the record that any witness was coerced to testify or change his testimony. Each witness was placed under oath in a form designed to impress that duty upon his conscience, as required by Arizona Rule of Evidence 603. Any minor discrepancies with prior statements to law enforcement are fairly related to the passage of time. Moreover, Humelhans had ample opportunity to cross-examine and impeach each witness with prior inconsistent statements.

**¶54** Second, the State did not err in advising the trial court of a defense witness's outstanding arrest warrant. The statement was made in the context of avowing to the court that the State had no interest in acting on the information, or impeding his son's "free, clear and unfettered access to this courtroom . . . ." Additionally, the existence of the alleged warrant is irrelevant to the proceedings as Humelhans' son was precluded from testifying on other grounds. *See supra* Part IX.

## XII.    Ineffective Assistance of Counsel

**¶55** Humelhans further suggests his trial counsel was deficient. We do not consider claims for ineffective assistance of counsel on direct appeal; they must instead be raised in a petition for post-conviction relief under Arizona Rule of Criminal Procedure 32. *State v. Spreitz*, 202 Ariz. 1, 3, ¶ 9, 39 P.3d 525, 527 (2002).

## XIII.    Presentence Incarceration Credit

**¶56** A review of the record reveals that Humelhans was taken into custody on April 14, 2012, where he remained until his sentencing on July 29, 2013. Based upon these dates, Humelhans was entitled to 471 days of presentence incarceration credit. *See* A.R.S. § 13-712(A)-(B). At sentencing, he was awarded 476 days of presentence incarceration credit. Because the error in awarding five additional days benefitted the defendant and was discovered in the context of his own appeal, the order stands. *State v. Kinslow*, 165 Ariz. 503, 507, 799 P.2d 844, 848 (1990).

## CONCLUSION

**¶57** After reviewing the entire record for reversible error, we find none. *See Leon*, 104 Ariz. at 300, 451 P.2d at 881. All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure. So far as the record reveals, Humelhans was represented by counsel at all stages of the proceedings and was present at all critical stages. The record shows no evidence of jury misconduct and the jury was properly comprised of twelve jurors. *See* A.R.S. § 21–102(A); Ariz. R. Crim. P. 18.1(a).

**¶58** Sufficient evidence was presented for the jury to find Humelhans committed the offense of first degree murder as set forth in A.R.S. § 13-1105(A)(2). At sentencing, Humelhans was given an opportunity to speak, and the trial court stated on the record the evidence and materials it considered and the factors it found in imposing sentence. The trial court imposed the only available sentence for the offense, and Humelhans shall receive the benefit of the error in calculating his presentence incarceration credit. The conviction and sentence are, therefore, affirmed.

**¶59** After the filing of this decision, defense counsel's obligations pertaining to Humelhans' representation in this appeal have ended. Defense counsel need do no more than inform Humelhans of the outcome of this appeal and his future options, unless, upon review, counsel finds an issue appropriate for submission to our supreme court by petition for review. *State v. Shattuck*, 140 Ariz. 582, 584-85, 684 P.2d 154, 156-57 (1984).

**¶60** Humelhans has thirty days from the date of this decision to proceed, if he wishes, with an *in propria persona* petition for review. *See* Ariz. R. Crim. P. 31.19(a). Upon the Court's own motion, we also grant Humelhans thirty days from the date of this decision to file an *in propria persona* motion for reconsideration.



Ruth A. Willingham · Clerk of the Court
F I L E D : jt